179 F.Supp. 721 (1959)
UNITED STATES of America, Plaintiff,
v.
BROWN SHOE COMPANY and G. R. Kinney Co., Inc., and G. R. Kinney Corporation, Defendants.
No. 10527(3).
United States District Court E. D. Missouri, E. D.
November 20, 1959.
*722 *723 Harry Richards, U. S. Atty., St. Louis, Mo., James J. Coyle, Bill G. Andrews, Lewis J. Ottaviani, Nicolaus Bruns, Jr., Edward M. Medvene, Antitrust Division, Dept. of Justice, Washington, D. C., for plaintiff.
Robert H. McRoberts and Edwin S. Taylor, Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., Arthur H. Dean, Henry N. Ess, III, Dennis C. Mahoney, Robin T. Tait, Sullivan & Cromwell, New York City, for defendant.
WEBER, District Judge.
This is a suit by the government to restrain the proposed merger of the defendants Brown Shoe Company, Inc., and G. R. Kinney Co., Inc., and G. R. Kinney Corporation, hereinafter to be referred to as Brown and Kinney respectively. The Complaint charges a violation of Section 7 of the Clayton Act[1] and seeks injunctive relief under Section 15.[2] Brown is a New York corporation and has its principal office and transacts business in this district and therefore this Court has jurisdiction of this proceeding.[3]
*724 The plaintiff filed its Complaint on November 28, 1955, and obtained an exparte temporary restraining order before the late Honorable Rubey M. Hulen. Upon hearing the evidence presented on plaintiff's Motion for Preliminary Injunction the Court was not convinced at that stage of the proceedings that plaintiff was entitled to a preliminary injunction pending a hearing of the cause on its merits. However, while the merger was permitted to continue, the businesses were ordered to be operated separately.[4]
The merger was effected on May 1, 1956, and throughout the trial hereof there has been no contention made or indicated that defendants have not complied with the preliminary order. Business has been done between defendants but, as far as the record is concerned at this time, the businesses have been operated separately and the assets have been kept separately identifiable in a new corporation licensed as G. R. Kinney Corporation. G. R. Kinney Corporation entered its appearance as a party to this suit[4] and hereafter the reference to defendant Kinney shall be construed as a reference to both G. R. Kinney Company, Inc., and G. R. Kinney Corporation.
Judge Hulen died on July 7, 1956, and this matter remained upon the docket without action until August, 1957, when various pre-trial conferences were begun and subsequently all discovery and preparation for trial was completed and the cause came on for trial before this Court on August 4, 1958. Full testimony was not completed until January 24, 1959, the matter was passed for filing of briefs and the cause was taken under submission on August 1, 1959.

I.

A. History of Brown
The evidence reveals that Brown and its predecessors have been engaged in the manufacture of shoes since 1877. In its present form, Brown was incorporated in the State of New York in 1913, and since that time has been engaged in the manufacture of men's, women's and children's shoes. In 1929 Brown began to experiment in operating a few retail outlets, but by 1945 had disposed of them and until 1951 engaged principally in manufacturing *725 and distributing its shoes to the consuming public through independent retailers, chain stores and mail order houses.
For a number of years Brown has had franchise arrangements with certain retailers. These franchise arrangements consist of committing the retailers not to carry competing lines of shoes of other manufacturers and in return they receive certain aids and assists from Brown by way of advertising, insurance, rubber footwear purchases, advice and help on inventories and inventory sales. Brown does not limit its sales to franchise dealers but has expanded its franchise operations since 1950.
Brown engages in extensive national advertising to develop consumer acceptance for its brand name shoes, viz., Buster Brown and Robin Hood for children's shoes; Naturalizer, Air Step and Life Stride for women's shoes; and Pedwin and Roblee for men's shoes. Brown also manufactures shoes for independent retailers under their brand names.

(Wohl)
In 1951 Brown acquired Wohl Shoe Company, hereinafter referred to as Wohl. Wohl was then a well-established corporation which operated 250 shoe departments in various department stores located throughout the United States. Most of its outlets were located in medium-sized cities and specialized in women's shoes. It operated a wholesale division which bought from various manufacturers, including Brown, and sold its own brand name shoes to some independent retailers, to its own retail outlets (leased shoe departments in various department stores) and to Wohl-plan accounts (independent retailers throughout the country who are not permitted to handle competing lines of shoes under trade names other than Brown or Wohl and who receive certain merchandising aids and assists and have credit arrangements under which they file weekly statements showing total sales and expenses and remit the weekly sales receipts, after deducting salaries and expenses, to be applied against their outstanding account). Wohl was, at the time of acquisition, the nation's largest operator of leased shoe departments. Since acquisition, Wohl operates as a separate division of Brown but there has been an interchange of corporate officers.
In 1950 (before acquisition) Wohl bought $2,884,328, or 12.8% of its purchases, from Brown. In 1952 (after acquisition) purchases increased to $6,018,939, or 21.4%; in 1955, to $10,758,518, or 32.6%, and in 1957, to $12,099,201, or 33.6%. In 1950, Wohl ranked ninth among shoe firms in net sales and Brown fourth. By 1955, including Wohl, Brown had moved into third place in net sales.

(Regal)
In 1954 Brown acquired Regal Shoe Corporation, hereinafter referred to as Regal, a Massachusetts corporation, which operated one manufacturing plant producing men's shoes and 110 retail stores. Regal manufactured shoes for sale at retail in its own retail stores and also purchased shoes from other manufacturers for sale therein. Regal operated a few shoe departments and also sold some of its manufactured products, under private brand names, to chain stores and other distributors of shoes. Regal had acquired the Curtis Shoe Company in 1954. The Regal Shoe Manufacturing Company was incorporated in 1954 as a wholly-owned subsidiary of Regal Shoe Company and certain assets of Regal Shoe Company were transferred to the new corporation. After the merger between Regal and Brown there was an interchange of corporate officers.
Before its acquisition, Regal sold no shoes to Wohl. In 1955, after the acquisition, Regal sold $2,000 worth of shoes to Wohl and in 1956 this increased to $265,000. It sold $89,000 to Brown in 1953, $544,000 in 1954, $599,000 in 1955 and $744,057 in 1956. Before Kinney's acquisition by Brown, Regal never sold shoes to Kinney. By 1956 it had sold and delivered $359,000 worth of shoes to Kinney.
*726 At the time the Regal sales to Brown and its affiliates were increasing, Regal's sales to other concerns, unconnected with Brown, decreased. For example, in 1953 Regal sold 51,815 pairs to those other concerns at $278,000, and by 1955 this decreased to 14,864 pairs at $92,000.

(Wetherby-Kayser)
In 1952 Brown and the Florsheim Shoe Company had each purchased a total of approximately one-third of the capital stock of Wetherby-Kayser, which operated retail stores in the Los Angeles area. In 1953, International Shoe Company acquired Florsheim and Brown acquired Florsheim's stock in Wetherby-Kayser. Subsequently, in 1953, Brown acquired the remaining outstanding stock of Wetherby-Kayser. Since that time Brown officials serve as officers of its board.
Brown had been a small supplier of Wetherby-Kayser before acquisition. In 1952, when Brown and Florsheim began to acquire its capital stock, Brown sold Wetherby-Kayser $23,144 worth of shoes, or 10.4% of its total purchases. In 1953, during Brown's acquisition of all of Wetherby-Kayser's stock, this had increased to $137,958 or 49.2% of its total purchases. Since 1954, Wetherby-Kayser's purchasing has been assumed by Wohl and 50% of its requirements come from Brown.

(Other Retail Acquisitions)
Brown acquired the Richardson Shoe Store, Corpus Christi, Texas, in 1952, which operated one retail store. In 1954, Brown acquired the Wohl Shoe Company of Dallas, Texas, (not connected with Wohl) which operated leased shoe departments in Dallas. In 1954 Barnes and Company of Midland, Texas, which operated two retail shoe stores was also acquired by Brown; Barnes purchased shoes from manufacturers located outside of Texas, including Brown.
In 1955 Brown acquired the T. D. Reilly Shoe Company, hereinafter referred to as Reilly, which operated two leased retail shoe departments in Columbus, Ohio. Reilly had been purchasing its shoes for retail from various suppliers and manufacturers outside the State of Ohio, including Brown.

(Manufacturing Acquisitions)
From 1913 Brown's manufacturing facilities grew and expanded through the building and acquisition of additional plant facilities. It acquired Barton Bros. of Kansas City, Missouri, in that year. In 1946 Brown purchased the trust certificates representing the stock of the Ermtree Shoe Company and its affiliate Footkind Shoe Company. In 1948 it acquired the assets of the Milius Shoe Co., consisting of a factory at Piggott, Arkansas, and a leased plant at Festus, Missouri. In 1950 it acquired the assets of Spalsbury-Steis Shoe Company, which operated a manufacturing plant at Fredericktown, Missouri. In 1952 it acquired the capital stock of the Bourbeuse Shoe Company, which operated a factory at Union, Missouri. In 1953 it acquired the stock of Monogram Footwear, Inc., which operated a factory at Trenton, Illinois, the stock of the O'Donnell Shoe Corporation, which operated a factory at Humboldt, Tennessee, and the stock of Kaut, Lauman, Winter, Inc., which operated a factory at Dixon, Missouri.
These acquired companies produced and sold their shoes outside of the states in which they were located and are presently operated by the Shoe Manufacturing Division of Brown. In these acquisitions Brown obtained two trade names, "Risque" and "Propr-Bilt", and has continued to use those names. Brown increased the number of its manufacturing plants from 20 in 1945 to second place in the industry, with 42 plants operated, by 1956.
In 1926 Brown acquired the stock of Moench Tanning Company, Inc., which operated two tanneries. Brown now operates factories that supply some of its wood heels, soles and shoe cartons. It has steadily increased its production of leather, cut soles, heels and cartons and has expanded and acquired manufacturing facilities therefor. It's manufacturing division operates a centralized purchasing *727 and distribution facility for buying and supplying the manufacturing needs of its various shoe plants, and its large quantity purchasing results in definite price advantages.

(Sales and Assets)
Between 1950 and 1955 Brown's total dollar sales increased from $89,313,000 to $159,481,000 and its assets from $36,490,000 to $72,396,000. It's total net sales and assets have consistently increased since 1955.
There is a dispute between plaintiff and defendants on the manner in which the above assets were arrived at and determined. However, regardless of the dollar figures, the evidence here is undisputed as to the fact that in 1955 Brown was the fourth largest shoe manufacturer in the United States. It produced in that year, 25,648,000 pairs of shoes, or 3.97% of the nation's total production. In 1957, when combined with Kinney, Brown's production increases to 29,105,105 pairs of shoes, or 5% of the nation's total shoe production and would place it third in the industry.[5]
Asset-wise, pair production-wise and net sales-wise, Brown, with the acquisition of Kinney, would move from the fourth position in the industry to the third position.

B. History of Kinney
Kinny was established in 1894 and operates four manufacturing plants producing men's, women's and children's shoes. These plants sell their products principally to Kinney's own retail outlets but do sell some unbranded shoes to chain stores, mail order houses and other distributors.
Kinney's principal business, however, is the operation of family-style retail shoe stores. It operates in more than 270 cities throughout the United States and at the time of trial had approximately 411 such retail stores. Its retail stores obtain about 20% of their shoes from their own manufacturing plants and 80% from other manufacturing sources, now including Brown and Regal.
In 1954 Kinney purchased no shoes from Brown or any of its affiliates. By 1957, 7.9% of all of its purchases, in the amount of $1,546,856, were from Brown and Regal, making Brown the largest single supplier of Kinney's shoes. By 1957 Kinney's wholesale sales to Brown and Wohl retail outlets tripled and by the first half of 1958 had more than quadrupled. During this same period Kinney's sales to independent retailers diminished.

(Sales and Assets)
Kinney's net sales increased from $35,228,000 in 1950 to $51,661,000 in 1955. During this same period its assets grew from $13,000,000 to $18,000,000. While there is some dispute between plaintiff and defendants as to how the asset figures were arrived at, there is no dispute but that Kinney ranked eighth asset-wise among all shoe firms in the nation in 1955, and was twelfth in number of pairs produced and seventh in net sales.
Kinney produced 0.5% of all shoes manufactured in 1955 and had 1.2% of all national retail sales. By the time of trial Kinney had added 51 new retail outlets and is the largest family shoe store chain in the nation.

[Finding of Facts as to History of Brown-Kinney]
All of the foregoing the Court finds to be the facts in this cause concerning the history, type of business, size, method of operation and position in the industry of Brown and Kinney.

*728 II.

History of The Clayton Act
The country's first experience in antitrust and monopoly legislation was in 1890 when Congress passed the Sherman Act.[6] Thereafter huge consolidations and mergers flourished. In 1911 the Supreme Court enunciated the "rule of reason" in Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 518, 55 L.Ed. 619, and many felt that this decision further weakened the Sherman Act and that it was ineffective in halting the growth of trusts and monopolies. The concern for the preservation of the free enterprise system resulted in the enactment of the Clayton Act in 1914.[7] Its purpose was to fill the gaps and to halt anti-competitive acts before they reached the magnitude required by the Sherman Act. See United States v. E. I. du Pont De Nemours & Co., 353 U.S. 586, 589, 77 S.Ct. 872, 1 L.Ed.2d 1057.
After the passage of the Clayton Act, Section 7 thereof was held to have several limitations. One was that it was not believed to apply to vertical mergers, i.e., mergers within the industry proceeding forward to or backward from the ultimate consumer. United States v. Bethlehem Steel, D.C., 168 F.Supp. 576, 582; Cf. United States v. E. I. du Pont, supra. Another was that the section did not cover acquisitions of assets, but only applied to acquisitions of stock. Thatcher Mfg. Co. v. Federal Trade Commission, 272 U.S. 554, 47 S.Ct. 175, 71 L.Ed. 405. Other limitations were that the Act itself required that the effect of the acquisition had to substantially lessen competition between the corporation whose stock is acquired and the corporation making the acquisition, and the restraint of commerce was confined to any section or community. 38 Stat. 731, 15 U.S.C.A. § 18.
In 1950, Congress amended the Clayton Act in order "that the economic system be protected against those forces of monopoly which would destroy it". Congressional Report No. 1191, August 4, 1949, on H.R. 2734 at pages 12-13. That Report shows that the Congress intimated that everybody, business, labor, consuming public and all citizens, both corporate and individual, have a stake in preventing the destruction of our economic system. Section 7, as amended, provides a prohibition of the acquisition of stock or assets "where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly".[1]
In other words, where the Act had previously dealt only with stock acquisitions and required substantial lessening of competition between the acquiring and acquired corporations and had narrowed the restraint to any section or community, it now prohibits, (a) any acquisition of stock or assets (b) in any line of commerce (c) in any section of the country (d) where the effect may be substantially to lessen competition or tend to create a monopoly. United States v. Bethlehem Steel, supra, 168 F.Supp. loc. cit. 582: United States v. E. I. du Pont, supra, 353 U.S. loc. cit. 591, 77 S. Ct. loc. cit. 876; American Crystal Sugar Co. v. Cuban-American Sugar Co., D.C.S.D.N.Y.1957, 152 F.Supp. 387, 395, affirmed, 2 Cir., 1958, 259 F.2d 524.

III.
Therefore, the problem in this and any other Section 7 case is to go to the facts of the case and resolve those facts in the light of the Congressional intention in the Act and the courts' interpretation of *729 both the Congressional intention and the Act.
We have here an acquisition by Brown of the stock of Kinney. This is such an acquisition as contemplated by the statute and once there is such acquisition there then remains three issues present for determination. They are: (1) line of commerce, (2) section of the country, and (3) the impact of the merger.
Let us take up these elements in that order:

(1)

Line of Commerce

(Government's Contention)
The government here contends that "shoes" as a class, or, in the alternative, "men's", "women's" and "children's" shoes considered separately, should be the "line of commerce".
Plaintiff argues first that shoes are a class product distinguishable from all others; that defendants manufacture, distribute and sell shoes of all types, in numerous sizes and for every member of the family; that the same machinery is used to produce shoes of different types and grades and that production is often converted between types and grades; that component parts of shoes and wages are industry-wide and therefore prices tend to be industry-wide.
For its alternative argument, plaintiff contends that shoes for "men", "women" and "children" are all sold in some stores and that there are also stores selling these separately or in combinations less than all three; that the trade literature speaks in terms of "men's", "women's" and "children's" shoes; that there is sufficient proof to show that each has sufficiently distinct characteristics and uses to make each a separate "line of commerce".

(Defendants' Contention)
Defendants contend that differences in grades, qualities, prices and uses of shoes should be considered in determining the relevant "line of commerce".
In other words, defendants state that where certain lines of shoes might stop at a $3.50 price and another line start at a $4.50 price, each could be a separate line; that price determines quality and thus quality enters the picture of consideration; or, that a shoe might be classified in the trade as a "casual", "dress", "play" or "work", and as such each could be a separate line; that the peculiar characteristics of the product, rather than the constitution or characteristics of the customer, determine whether or not we are dealing with products that have "interchangeability"; that upon these considerations the total shoe product could be separated into "lines of commerce" as to grade, quality, price and use and the government has failed to meet the burden required.

(Review of the Cases)
Before going to the facts in evidence, let us turn to the case law on this subject for any guideposts that might be found to help in resolving the facts.
There can be no question but that the burden is upon the government to establish the "line of commerce". United States v. E. I. du Pont, supra, 353 U.S. loc. cit. 583, 77 S.Ct. loc. cit. 875; In the Matter of Pillsbury, Inc., 50 F.T.C. 555, 569, 8-10 C.C.H. Trade Reg. Rep. § 11582.
"Line of commerce" refers to a product market and has been defined as any product, or group of products, that has "[sufficient] peculiar characteristics and uses which make it distinguishable from all other products". United States v. E. I. du Pont, supra, 353 U.S. loc. cit. 593, 77 S.Ct. loc. cit. 877; United States v. Bethlehem Steel, supra, 168 F.Supp. loc. cit. 589, 592.
The government and the defendants have cited, explained and tried to rationalize the whole gamut of cases dealing with the problem of the "line of commerce" as it arises in the antitrust field. Some of these cases deal with the theory of "reasonable interchangeability" introduced *730 as a consideration of the relevant market in an earlier du Pont case, commonly called the Cellophane case. United States v. E. I. du Pont De Nemours & Co., 1956, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264. See also American Crystal Sugar Co. v. Cuban-American Sugar Co., supra. The "price", "grade" and "quality" factors were noted as they were dealt with in Hamilton Watch Co. v. Benrus Watch Co., D.C.Conn., 114 F.Supp. 307, affirmed 2 Cir., 1953, 206 F.2d 738. The Bethlehem Steel case, supra, was cited as authority for the establishment of separate lines of commerce within a broad line of commerce.
The earlier du Pont (Cellophane) case has been distinguished and limited as applying to the monopolization clause of Section 2 of the Sherman Act. See United States v. Bethlehem Steel, supra, 168 F.Supp. loc. cit. 593 note 36. Yet, the American Sugar Co. case, supra, a Section 7 case, leads to the conclusion that "interchangeability" cannot be ignored as a factor where, under the circumstances, the products are more or less the same.
The Hamilton Watch Co. case, supra [114 F.Supp. 317], considered jewelled watches as a "line of commerce" regardless of differences in the number of jewels or the prices charged. The Court held that the two companies competed actively with each other and all other companies in the sale of nationally advertised branded jewelled watches.
In the Bethlehem Steel case, supra, 168 F.Supp. loc. cit. 595, the Court adopted the steel industry as a whole, and within the whole, divided further into separate lines of commerce with respect to various individual steel items. It declared both the whole and the divisions as separate lines of commerce.
The case of International Shoe Co. v. Federal Trade Commission, 280 U.S. 291, 50 S.Ct. 89, 74 L.Ed. 431, where the Supreme Court overruled the Commission's order prohibiting the acquisition and indicated that prices and quality between the two companies were not the same, can be distinguished from the instant case for three reasons: (1) the precarious financial condition of the acquired (McElwain) company was a determining factor, for loc. cit. 301 of 280 U.S., loc. cit. 92 of 50 S.Ct., the Court said:
"* * * the evidence establishes the case of a corporation in failing circumstances, the recovery of which to a normal condition was, to say the least, in gravest doubt, selling its capital to the only available purchaser in order to avoid what its officers * * * concluded was a more disasterous fate.";
(2) the companies were found to be competing in entirely different sized communities and; (3) the case was decided in 1930 and at that time Section 7 of the Clayton Act was limited to a lessening of competition between the acquired and the acquiring company.
In the Hamilton Watch case, supra, the Second Circuit Court of Appeals loc. cit. 741 of 206 F.2d, said:
"Although we now indulge in no ultimate conclusion, we believe the amendment of Section 7 in 1950 certainly casts doubt on decisionsincluding International Shoe Co. (citation omitted) and United States v. Columbia Steel Co. [334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533]."
An analysis of the maze of cases on the subject leads one to the conclusion that a "line of commerce" cannot be determined by any process of logic and should be determined by the processes of observation. See International Shoe case, supra, 280 U.S. loc. cit. 299, 50 S.Ct. loc. cit. 91.
Therefore, we must go to the facts in the case and see what the testimony here reveals and make a determination of the "line of commerce" from the practices in the industry, the characteristics and uses of the products, their interchangeability, price, quality and style. In other words, determine how the industry itself and how the users, the public, treat the shoe product. In this regard, it becomes necessary that each case stand upon its own particular facts.

*731 [Finding of Facts as to "Line of Commerce"]
The evidence in the case at hand shows a certain degree of interchangeability in the shoe industry. First, there is the interchangeability in the manufacturing process; for instance, welt shoes may be made for men, women and children and if so, some of the same machinery is used; or machinery for cement shoes, or stitch down shoes, may be as readily applied to the shoe for the large child as for the small child or the young boy or young miss; the factory producing men's shoes may also produce sizes for growing boys or teenagers; the same is true in the women's lines as to growing girls and the young miss; shoe manufacturers allow their sizes to overlap at the ends of their lines to meet the needs and the pocketbooks of their intended customers.
There is this noticeable fact, however, that shoe manufacturers making "men's", "women's" and "children's" shoes separate their production as to each of the above categories in separate plants.
Second, there is the question of interchangeability in price, style and quality; for instance, shoes manufactured with cheap quality material are often made to look exactly like the higher priced shoes; the average store window shopper, uninitiated in matters of shoe quality, can easily mistake one shoe for the other; one buyer, without the money to pay for the higher quality, may still want to imitate that quality by buying the cheaper shoe that resembles it; the retailer points out the features about his particular line of shoes by either telling his customer that his is better quality or style, or, that in his price line the better quality and style is imitated.
Therefore, while quality eventually determines both the wholesale and the retail prices, the manufacturers definitely attempt to copy the styles of the higher priced shoes in the lower priced lines and the retailers definitely attempt to sell to the public as a whole, whatever price, style or quality line they may be carrying.
Third, there is the interchangeability of the use to which shoes are put by the customers; for instance, one person may wear the casual to work, another to school, another to the country club and yet another wear it on an outing; one person may wear the work shoe to church, while another may wear it to the woods; one may wear his or her "new shoes" to dress up in, and as they get older and shabbier, wear them to work or to do the sun-up to sun-down chores about the house.
Likewise, the size of the foot does not always determine the age of the possessor of the foot. Some boys can, and must, wear men's shoes; some girls may of necessity wear women's sizes; some women, with pride, may slip into the size of a miss. The old cliche of "filling someone else's shoes" is still a mental ability or incentive and not a physical attribute or characteristic. Nor does the type of shoe always determine the use to which it is to be put, for mores, habits, and economics may determine where, when and how often we wear them.
There is this noticeable fact, however, shoes are distinct as to the sexes (except children's) and regardless of overlapping at the beginning and end of the size runs, the male and female population wear distinctly different types of shoes. Children wear the same shoes up to necessary changes required because of size and then the same male and female distinctions take over.
Fourth, the shoe people themselves admit that their trade classifications into "casuals", "misses", "growing boys", "women's dress", "men's dress", "work", "play", "crib", "first steps", and the maze of other characterizations attempted by the manufacturers and the retailers to differentiate their lines or to catch the buying eye, do not determine the use to which the shoe is put or by whom it will be put. They do not agree among themselves as to definitions of these various *732 categories. Many of the categories are used interchangeably and the public uses the shoe product interchangeably.
There is this noticeable fact, however, that there is one group of classifications which is understood and recognized by the entire industry and the publicthe classification into "men's", "women's" and "children's" shoes separately and independently. Brown and Kinney each manufacture and sell men's, women's and children's shoes. While there is a close question as to whether "shoesas such" could be treated as a "line of commerce" and, while there is argument for a breakdown into quality, style, price and intended use, there can be no question or argument either legal, logical or evidentiary, but that it can be said that all "men's shoes", regardless of quality, style, price and intended use, have sufficient peculiar characteristics and uses to make them distinguishable and a "line of commerce". The same can be said separately as to all "women's shoes" and all "children's shoes". On this the government has sustained its burden.

Conclusion

Line of Commerce
The Court finds the foregoing to be the facts and from those facts it is found and determined that the "line of commerce" in this case should be, and is hereby declared to be, "men's", "women's" and "children's" shoes, each considered separately. To classify shoes as a whole could be unfair and unjust; to classify them further would be impractical, unwarranted and unrealistic.

(2)

Section of the Country
As previously stated, in addition to "line of commerce" it is necessary to determine "section of the country". Here again, while the word "market" does not appear in the Act, when we talk about "section of the country" we are actually talking about the geographic market.

(Government's Contention)
The government contends that the nation as a whole constitutes a "section of the country" for both retailing and manufacturing. In the event the Court should not adopt that contention as to retailing, the government takes the alternative position that it should be a city, or a city and the immediate surrounding area.

(Defendants' Contention)
The defendants admit the country as a whole constitutes a "section of the country" for manufacturing, but contend that what they call a "standard metropolitan area" is the proper designation for retailing. They would define such an area as an economic unit which is commonly the result of consolidating political units, its borders being defined by the flow of local commerce as measured by objective economic indicators.

Manufacturing
Brown and Kinney both manufacture and retail "men's", "women's" and "children's" shoes throughout the nation. The parties have agreed that as far as manufacturing is concerned, the whole of the United States is a "section of the country" and the evidence supports this.

Conclusion

Section of the Country

(Manufacturing)
Therefore, from the evidence and because there is no dispute, the United States is found to be the effective area of competition for manufacturing. From the finding heretofore entered on "line of commerce" the Court further finds that this applies as to "men's", "women's" and "children's" shoes, considered separately.

Retailing
This leaves for consideration and further determination the "section of the country" with reference to the retail market. Kinney has its own family shoe stores scattered throughout the United *733 States. Brown has its Wohl-plan stores, its Wohl leased departments, its Regal, Wetherby-Kayser and Brown franchise stores, as well as a few company-operated stores and the independent retailers to which it sells and all are scattered throughout the entire country.

(Review of the Cases)
The burden is upon the government to establish the "section of the country". This has been heretofore covered in discussing the "line of commerce" and the same citations apply.
In the Senate Committee Report No. 1775, 81st Congress, 2d Session, 1950, when the amendment to Section 7 was being considered, it was stated:
"What constitutes a section will vary with the nature of the product. Owing to the differences in the size and character of markets, it would be meaningless, from an economic point of view, to attempt to apply for all products a uniform definition of section, whether such a definition were based upon miles, population income, or any other unit of measurement. A section which would be economically significant for a heavy, durable product, such as large machine tools, might well be meaningless for a light product, such as milk." Id. pp. 5-6.
In Standard Oil Co. of California and Standard Stations v. United States, 337 U.S. 293, 299 note 5, 69 S.Ct. 1051, 1055, 93 L.Ed. 1371, the Supreme Court said:
"Since it is the preservation of competition which is at stake, the significant portion of coverage is that within the area of effective competition."
See also Senate Committee Report No. 1755, supra, and United States v. Bethlehem Steel Corporation, supra, 168 F. Supp. loc. cit. 595-596.
The city and surrounding area was adopted as a "section of the country" in the case of United States v. Maryland and Virginia Milk Prod. Ass'n, D.C., 167 F.Supp. 799. The case involved milk dealers in the Washington metropolitan area which consisted of the District of Columbia and nearby Maryland and Virginia. The Bethlehem Steel case, supra, 168 F.Supp. loc. cit. 608, 618-619, adopted the United States as a whole, certain states separately, combinations of states and a quadrant of states, as separate effective areas of competition.
In the American Crystal Sugar case, supra, 152 F.Supp. loc. cit. 398, the Court pointed out that the applicable sections of the country comprising a ten state area and a three state area were "not mere legal abstractions but correspond to the commercial realities of the sugar industry." In International Shoe, supra, the Supreme Court distinguished between cities of over 10,000 population and cities of 6,000 or less.
In Transamerica Corp. v. Board of Governors, 3 Cir., 1953, 206 F.2d 163, 170, certiorari denied 346 U.S. 901, 74 S.Ct. 225, 98 L.Ed. 401, the Court stated:
"It necessarily follows that under Section 7, contrary to the rule under Section 3, the lessening of competition and the tendency to monopoly must appear from the circumstances of the particular case and be found as facts before the sanctions of the statute may be invoked."
Thus, a review of the cases leads this Court to the conclusion that each case must stand upon its own facts as to the determination of the area or areas of effective competition. This area must be determined by economic reality and not necessarily by political boundaries or with mathematical precision. Neither can it be determined solely from testimony of economists.
The economist may give his review of trends and his prognosis of the future, yet, it also remains for the people in the business to tell us the actual effects, the practical results and where and whose competition they meet.
Let us review then, the evidence offered by the parties, both from their economists and from the people in the business.

*734 [Finding of Facts as to Section of the Country]
The evidence in this cause shows that shoe retailers primarily and generally sell shoes in the following categories: (1) men's, (2) women's, (3) women's and children's and (4) men's, women's and children's or, the family type store.
Kinney is primarily a family type store and operates attractive places of business with prominent window displays and in good locations in cities of 10,000 or more population and usually in the corporate limits or its environs. Its merchandise is in the low or medium price range, is of excellent quality for the price and imitates the higher priced styles. Its store operations are aggressive and highly competitive.
Brown operates its retail outlets, primarily selling women's shoes through Wohl, men's shoes through Regal, and men's, women's and children's shoes through Wetherby-Kayser, Reilly and others and through the stores that operate under the Brown franchise arrangement. Their stores and leased departments are in cities of 10,000 or more inhabitants, are well located, attractive, sell low, medium and medium-high priced shoes. The brand names are well advertised and the stores are aggressively operated and competitive.
The area in which this Court sits was thoroughly gone into in the evidence. St. Louis is a city with defined geographical limits; surrounding it is St. Louis County, which is composed of numerous municipal corporations and a large unincorporated area. Across the river in the State of Illinois are other well defined corporate area and their surrounding territories. People from each and all of the these areas work, shop and trade in their area and interchangeably.
Within the corporate limits of the City of St. Louis and within the corporate and unincorporated areas around St. Louis, are found many huge concentrated shopping areas. For instance, a large downtown department store will go out into an outlying area, put up a similar store and surround it with building facilities for merchants selling everything from drugs to clothing, to food, to knick-knacks and sundries. These areas cater to personal services such as barber shops and hair dressers, insurance offices, doctors and dentists and many have retail shoe stores. The downtown department store and the outlying department store have the same type of departmental operations, including shoes.
The evidence in this case as to the St. Louis area supports the conclusion, and it is a reasonable one, that shoe retailers downtown, in corporate areas surrounding the downtown, in unincorporated areas surrounding the corporate areas, plus the shoe retailers in between and at the fringesall are in competition with each other. For example, the worker downtown may buy his shoes during the noon hour while his wife buys her shoes and the children's shoes in the outlying shopping center; or, they may all wait and go to the shoe store together either in the outlying area or downtown. The discriminating buyer might not find the shoe he or she wants in the outlying area and will make a trip downtown to get it. The advertising, carried in the various media of the area, refers to a store and all of its branches in the entire area.
It is further apparent from this evidence that in this area price and quality are not necessarily synonymous factors. As heretofore pointed out in discussing "line of commerce", the buying public may have many reasons why they buy a particular shoe, at a particular price, either in consideration of quality or regardless of quality.
What is true in the evidence concerning the area in which this Court is located is likewise true to greater or lesser extent throughout the entire United States. The United States has seen a tremendous growth in and around large cities. This growth is more evident among cities containing populations of 10,000 and above. People have been moving *735 to metropolitan areas. Industry has been expanding in metropolitan areas and people have moved in and around the places of their work. The mercantile business has expanded to the same areas where the population has increased. Everybody in the same business, in every area where there are lots of people, is in competition with the other fellow who is in the same business. This is true of the shoe retailers and shoe people have so testified.
The testimony in this case shows that Brown franchise dealers in downtown metropolitan areas are competing with Brown franchise dealers in the outlying areas. They are competing with other retailers in the same business. The same is true of Kinney; the same is true of Wohl; the same is true of Regal; the same is true as between Brown, Kinney, Wohl and Regal.
The evidence here shows that retailers of "men's", "women's", and "children's" shoes, whether sold separately or in combinations thereof, are actively, forcefully, competitively and actually vying with those handling a like line for the trade of the people in their cities and the immediate and contiguous surrounding area.
The evidence here shows that more than 12 million pairs of Brown's shoes and 7 million pairs of Kinney's were sold in the same cities. There are at least 141 cities of over 10,000 population, in which there is located a Kinney retail store and there is also a Brown operated, Brown franchise or a Brown plan account outlet. These stores are all in competition with each other in those cities at the retail level in the sale of the "men's", "women's" and "children's" shoes handled and with every other shoe retailer therein located and so handling. These Brown stores have a varying share of the retail market therein, as do Kinney's stores; those percentages are substantial and if combined would become more substantial.
What then is the "section of the country" as it relates to shoe retailing and as it can be determined by this evidence? Is it the city limits? Is it the city and surrounding areas? Is it the standard metropolitan area?

Conclusion

Section of the Country

(Retailing)
The Court finds the foregoing to be the facts as supported by the evidence of this case and, it is the Court's conclusion therefrom that the areas of effective competition for retailing purposes cannot be fixed with mathematical precision or by political boundary. However, when determined by economic reality, for retailing, a "section of the country" is a city of 10,000 or more population and its immediate and contiguous surrounding area, regardless of name designation, and in which a Kinney store and a Brown (operated, franchise, or plan) store are located.[8]
In reaching this conclusion, the Court also finds the government has sustained its burden and adopts all findings of fact heretofore set forth in discussing the "History of Brown and Kinney", the "Line of Commerce" and such findings of fact as may hereafter be set forth.

(3)

Impact of The Merger
The third phase of a Section 7 case is the impact of the merger because the Act prohibits an acquisition in a line of commerce, in any section of the country, where the effect may be to substantially lessen competition or tend to create a monopoly.[1]

*736 (Review of the Cases)
In United States v. Bethlehem Steel, supra, 168 F.Supp. loc. cit. 603, it was stated:
"The ultimate question under section 7 is whether an acquisition may substantially lessen competition or tend to create a monopoly within the relevant market. The Government is not required to establish with certitude that competition in fact will be substantially lessened. Its burden is met if it establishes a reasonable probability that the proposed merger will substantially lessen competition or tend to create a monopoly. * * *
"There may be a substantial lessening of competition or tendency to monopoly when a merger substantially increases concentration, eliminates a substantial factor in competition, eliminates a substantial source of supplies, or results in the establishment of relationships between buyers and sellers which deprive their rival of a fair opportunity to compete."
And at loc. cit. 606, the Court further stated:
"The increased concentration which would result from the merger cannot be considered in a vacuum; it cannot be divorced from the history of mergers and acquisitions, which in large measure accounts for the existing high degree of concentration in the industry."
See also Senate Report 1775, supra; H.R.Rep. No. 1191 p. 8; United States v. E. I. du Pont, 353 U.S. 586, supra.
In United States v. du Pont, 353 U.S. 586, loc. cit. 592, 77 S.Ct. 872, loc. cit. 876, 1 L.Ed.2d 1057, supra, the Supreme Court said:
"We hold that any acquisition by one corporation of all or any part of the stock of another corporation, competitor or not, is within reach of the section whenever the reasonable likelihood appears that the acquisition will result in restraint of commerce or in the creation of a monopoly of any line of commerce. * * * Judge Maris correctly stated in Transamerica Corp. v. Board of Governors, 3 Cir., 206 F.2d 163, 169:
"`A monopoly involves the power to * * * exclude competition when the monopolist desires to do so. Obviously, under Section 7 it was not necessary * * * to find that * * * [the defendant] has actually achieved monopoly power but merely that stock acquisitions under attack have brought it measurably closer to that end. For it is the purpose of the Clayton Act to nip monopoly in the bud. Since by definition monopoly involves the power to eliminate competition a lessening of competition is clearly relevant in the determination of the existence of a tendency to monopolize. * * *'"
Before the 1950 amendment the Act was held not to apply to vertical mergers and the courts were only confronted with horizontal mergers. In these, the trend was for big companies to acquire other big companies and the impact was either readily apparent or obviously imperceptible. When the amendment was under consideration, we find this reading in the Senate Report, supra, p. 5:
"As a large concern grows through a series of such small acquisitions, its accretions of power are individually so minute as to make it difficult to use the Sherman Act test against them * * *."
And in the same Report, p. 3:
"The figures presented * * * show that in the field of manufacturing above, the 25 largest corporations in 1948 owned 27 percent of the total assets of all manufacturing corporations, or a little more than average of 1 percent of the assets for each of the 25 corporations.
"The enactment of the bill will limit further growth of monopoly and thereby aid in preserving small *737 business as an important competitive factor in the American economy."
Certainly it is evident that Congress intended to encompass minute acquisitions which tend toward monopoly and to do so in their incipiency. Courts have recognized the necessity to act toward a violation as it begins, rather than wait until it has become fait accompli. See du Pont and Bethlehem Steel cases, supra.
In a determination of these factors it becomes necessary to review, not only the practices of the companies involved, but also the trends in the industry. In the American Crystal Sugar case, supra, the Second Circuit held that the lower court correctly understood and applied the proper test of legality when it said:
"He stressed the necessity for `consideration not merely of competition between the two companies, but also the competitive situation of the industry.'" Id., 259 F.2d at page 527.
When we review the cases and the Act as presently written, in the light of Congressional intent, it is concluded by this Court that the impact of the merger must be determined from factual situations of the companies involved and from trends in the industry. Likewise, we are not so much concerned with percentages, as such, but with what these percentages mean in examination under the light of the facts of the case and the economic realities involved.
What difference can it make that Brown has only 5% of the shoe production and Kinney 0.5%, when Brown is the fourth largest firm in the United States and Kinney with only 1.2% of all retail shoe sales is the largest family shoe chain retailer. Their combination moves Brown to third place in the industry. Does it then make sense to say that this is imperceptible because the percentages are small? Or rather, doesn't it make sense to say, that regardless of percentages or size, the test is, what do the facts show as to the trends in the industry and the true economic impact of this particular merger, which takes place among an industry having a few large firms that control a sizeable segment of the total with the balance divided among hundreds of others having only minute segments.
It is upon this analysis that the Court shall review the impact of the merger.

[Finding of Facts as to Impact of Merger]

Trend in the Industry
There is evidence in the record of a definite trend in the shoe industry of manufacturers of "men's", "women's" and "children's" shoes obtaining retail outlets that sell said shoes separately or in combinations thereof as heretofore defined. For example, International Shoe Company had no retail outlets in 1945, but by 1956 had acquired 130; General Shoe Company had 80 retail outlets in 1945 and 526 by 1956; Shoe Corporation of America, in the same period, went from 301 to 842; Melville Shoe Company from 536 to 947; and Endicott-Johnson from 488 to 540. And, as significant, or even more significant in this case, Brown, with no retail outlets in 1945 had acquired 845 such outlets by 1956.[9]
The evidence here shows that between 1950 and 1956, there were 9 independent shoe firms, operating 1,114 retail shoe stores, that became subsidiaries of large firms and ceased their independent operations. By 1956, the 6 largest firms *738 owned and operated 3,997, or 18%, of the nation's 22,000 shoe stores and the 13 largest firms operated 4,736, or 21%, of them.[10]
The evidence here also shows a definite trend in the industry to the effect that once manufacturers acquire retail outlets they definitely increase the sale of their own manufactured product to these retail outlets. The parent company becomes a larger and larger supplier of its acquired retail outlets and the outlets' purchases from independent manufacturers definitely and consistently become less and less. Chain stores and company-dominated stores are drying up the available outlets for independent manufacturers. Thus, the effect of this vertical integration in the shoe industry has been to increase the number of outlets dominated by large manufacturers and to seriously limit the market to which independent manufacturers are able to sell.
The evidence here shows that there is also a definite trend in the industry toward the decrease of the number of plants manufacturing shoes. Of the companies representing 95% of the entire industry, the number of plants operated decreased from 1,207 in 1950 to 1,048 in 1956. Of the 1,048 shoe manufacturing plants in 1956, about 20%, or 212, are owned and operated by 10 companies. Between 1950 and 1956, 7 companies independently operating 25 shoe manufacturing plants have become acquired by the 10 companies now operating 20% of all shoe manufacturing plants.
The testimony in this case further shows that independent retailers of shoes are having a harder and harder time in competing with company-owned and company-controlled retail outlets. National advertising by large concerns has increased their brand name acceptability and retail stores handling the brand named shoes have a definite advertising advantage. Company-owned and company-controlled retail stores have definite advantages in buying and credit; they have further advantages in advertising, insurance, inventory control and assists and price control. These advantages result in lower prices or in higher quality for the same price and the independent retailer can no longer compete in the low and medium-priced fields and has been driven to concentrate his business in the higher-priced, higher-quality type of shoesand, the higher the price, the smaller the market. He has been placed in this position, not by choice, but by necessity.

Brown-Kinney a Part of Trend
The evidence here shows that Brown, its affiliates and Kinney are a definite part of this trend in the industry. In fact, Brown has been a moving factor in this trend. As stated earlier in this Opinion, the evidence shows that in 1955 Brown sold no shoes to Kinney, but by 1957 had become its largest single supplier of shoes. That Wohl's purchases from Brown increased from almost $3,000,000 to over $12,000,000 from 1950 to 1957. That Brown's sales to Wetherby-Kayser increased from $28,000 to $138,000 during the time Brown was acquiring *739 control and today Brown sells it 50% of all its requirements. That percentage-wise, Wohl's purchases from Brown increased from 12.8% in 1950 to 33.6% in 1957, and Kinney's purchases from Brown increased from zero to 7.9% by 1957.
The evidence in this case further shows that one manufacturer who supplied Wohl with $1,230,527 worth of shoes in 1955, sold them less than $100,000 worth of shoes in 1958. Another manufacturer's sales to Wohl decreased from over $340,000 in 1950 to $68,970 in 1957. Other suppliers lost sales to Brown-controlled outlets in varying amounts and degrees.
The evidence here further shows that Brown, with the acquisition of Kinney, would have more retail outlets than any other manufacturer of shoes. That it would move from third to second in the industry in net sales.[11] That when considered from both the manufacturing and retail outlet standpoint, it would become the dominant shoe firm in the country.

Other Factual Findings
This Court finds from the evidence that while the acquisition of Kinney's manufacturing facilities might only slightly affect commerce on a nation-wide scale (5% to 5.5%), the greatest impact of the merger on manufacturing would be felt in the advantages of the company-controlled retail outlets. This impact is connected with manufacturing in that large manufacturers (including Brown) are acquiring retail outlets which purchase from them and smaller independent manufacturers are losing that market as the purchases increase. This substantially lessens competition between manufacturers and Brown has been, is, and is likely to continue to be, an ever growing part of this result.
This Court further finds that the acquisition by Brown of Kinney's large and vast retail outlets (which results in the increase of the ultimate retail market sales of the combined products of their two manufacturing enterprises) would definitely increase the final consumption of their combined product with advantages being obtained that tend toward monopoly both in ultimate sales increase and through price or profit advantage. If, by advantages in buying, selling, insurance, assists in business planning and practices, advertising and credit arrangements, the percentage of the retail sales by the combined company-owned and company-controlled stores increases, so likewise their power to control price increases; so likewise does their power to sell more and more of their own shoes tend to create a monopoly.
This Court further finds that the merger of Brown and Kinney would have a definite and substantial impact and effect upon shoe retailing of "men's", "women's" and "children's" shoes in every city of over 10,000 population and its immediate and contiguous surrounding area, and wherein a Brown and Kinney store is operated. This impact would be felt by other retail merchants in the same lines. This impact would result from buying and pricing advantages which would inure to Kinney by being a part of Brown and because of its already well solid position in the retail field. This impact would be felt in these areas by other manufacturers, especially the small independent manufacturer, in decreased outlets for his product. This impact would but add to the trend in the industry and to the past practices by Brown. The effect would be to substantially lessen competition and it definitely tends to create a monopoly in these areas.
The Court further finds from the evidence that due to the nature of the shoe industry, no one manufacturer, no one retailer, no one manufacturer-retailer *740 combined, has a large percentage of the market, wholesale or retail. Yet, a small group of firms control a sizeable segment of the market.[12] These firms definitely set the price and style trends. These firms are better able to meet the style trends and finance the change over. These firms are better able to acquire company owned stores and thus acquire ready-made markets for their production. These firms are better able to meet the changing conditions of the retail markets and to dominate the mass market in the low and medium priced fields.
This Court further finds that Kinney sold 6.4 million pairs of shoes in 1955, which it purchased from outside sources. This exceeds the production of any one manufacturer below the top six. As Brown continues to supply more and more shoes to Kinney and as Kinney converts more and more of its manufactured product to Brown affiliates, the effect on competition is already evident and the possibility is apparent.
This Court further finds that with Brown as a supplier and the advantages resulting therefrom, Kinney becomes a more dominant factor in each retail market in which it operates a store. It is eliminated as a competitive factor as against Brown and as independent retailers are forced to other lines or from the market, the tendency toward monopoly is already in effect and the further possibility is apparent.
This Court further finds that as the Brown-Kinney experience is weighed in the same scale with what is happening in the industry in the large manufacturer-retail outlet acquisitions, the trend is toward the eventual elimination of small manufacturers and independent retailers.

(Conclusion)
Whether the customerthe buying publicwould or would not benefit may be highly speculative. It is self-evident, however, that Congress has recognized that the final result of increased power can and will result to the detriment of the public.
We can only eat an apple a bite at a time. The end result of consumption is the same whether it be done by quarters, halves, three-quarters, or the whole, and is finally determined by our own appetites. A nibbler can soon consume the whole with a bite here and a bite there. So, whether we nibble delicately, or gobble ravenously, the end result is, or can be, the same.
If manufacturers such as Brown, sell at wholesale in the area of effective competition, their product (through all types of outlets) must of necessity reach the retail market of that area. Their company-owned and controlled retail stores have a percentage of that market and a combination of their businesses increases that percentage. Such increase, regardless of percentage amount, gives them power. Such power not only tends to create a monopoly, but substantially lessens competition by eliminating the effectiveness of the independent retailer and the smaller manufacturer.
Regardless of our economic or other philosophy; regardless of our ideas or thoughts about how good or how bad "bigness" or "control" may be; regardless of how necessary it may be for the smaller to grow bigger and the bigger to better compete with the biggest;[13] regardless of all of thesethe Congress has, down through the years, definitely *741 tightened the screws upon acquisitions in the effort to prevent mergers and acquisitions where, as now ultimately defined, competition is substantially lessened, tendency toward monopoly is created, either or both.
It is this Court's conclusion that the merger of Brown and Kinney would increase concentration in the shoe industry, both in manufacturing and retailing. The fourth manufacturer would become the third; the top four companies would control 23% of the production market and Kinney and Brown would have one-fifth of that; the two would become the largest operator of retail shoe stores in the nation; and Kinney becomes a smaller market for other manufacturers.
It is this Court's conclusion that the merger would eliminate Kinney as a substantial competitive factor to Brown in the shoe retailing field. The most aggressive retail chain in the nation, now a potent competitor of Brown, would become but another adoptive child of an already big family.
It is this Court's conclusion that the merger would establish a manufacturer-retailer relationship which deprives all but the top firms in the industry of a fair opportunity to compete. Kinney's already powerful position in the retail field is made more powerful by the proposed affinity with Brown. Other manufacturers have already suffered; other retailers have felt the effect; the reasonable probability is the further substantial lessening of competition and the increased tendency toward monopoly.

Holding
From all the facts heretofore found, from all the evidence herein and all reasonable inferences therefrom, this Court finds, concludes and holds that there is a violation of Section 7 (15 U.S.C.A. § 18) since, in fact and in reasonable probability, it is established:
(1) That while the acquisition of the manufacturing facilities of Kinney by Brown, would but slightly lessen competition or tend to create a monopoly when considered alone, the combination of the manufacturing-retailing facilities of Brown and Kinney would substantially lessen competition and tend to create a monopoly in the manufacturing of "men's", "women's" and "children's" shoes, considered separately, throughout the United States as a whole.
(2) That the acquisition of Kinney by Brown would substantially lessen competition and tend to create a monopoly in manufacturing-retailing and in retailing alone, in "men's", "women's" and "children's" shoes, considered separately, in every city of 10,000 or more population and its immediate and contiguous surrounding area, regardless of name designation, and in which a Kinney store and a Brown (operated, franchise or plan) store are located.
(3) That the government has sustained the burden of proof required therefor and the Court shall enter judgment requiring defendant Brown to relinquish and dispose of the acquired stock of defendant Kinney and thereafter enjoining Brown and Kinney, their agents, servants, officers and employees from acquiring any interest in the stock or assets of the other defendant.

Further Holding
There is one further aspect of this case which the Court should reserve for further consideration. The temporary order of Judge Hulen[4] allowed the acquisition to continue under certain restrictions and requirements. If this judgment should become final in its present form, the defendant Brown would be confronted with the necessity of the disposition of the stock of Kinney. This could have far-reaching effects and consequences.
In United States v. E. I. du Pont, supra, the Supreme Court, in overruling the trial court's decision, ordered that the district court conduct a
"* * * further hearing, of the equitable relief necessary and appropriate *742 in the public interest to eliminate the effects of the acquisition offensive to the statute. The District Courts, in the framing of equitable decrees, are clothed `with large discretion to model their judgments to fit the exigencies of the particular case'. (Citation omitted.)" Id., 353 U.S. 607-608, 77 S.Ct. 885.
It is this Court's conclusion that should this judgment become final, this Court should hear any evidence which the defendants might wish to offer touching the effects of the disposition of the stock and suitable manner in handling same. The government should be given an opportunity to express opposition or suggestion therein.
Therefore, the judgment to be entered will provide for such further hearing, rulings and final order.
NOTES
[1] 15 U.S.C.A. § 18, 64 Stat. 1125. "No corporation engaged in commence shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or tend to create a monopoly." (Other parts of the section are not herein involved.)
[2] 15 U.S.C.A. § 25, 38 Stat. 736. "The several district courts of the United States are invested with jurisdiction to prevent and restrain violations * * *, and it shall be the duty of the several district attorneys of the United States, in their respective districts, under the direction of the Attorney General, to institute proceedings in equity to prevent and restrain such violations. * * * Whenever it shall appear to the court before which any such proceeding may be pending that the ends of justice require that other parties should be brought before the court, the court may cause them to be summoned whether they reside in the district in which the court is held or not, * * *."
[3] 15 U.S.C.A. § 22, 38 Stat. 736. "Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; * * *."
[4] Judge Hulen's Memorandum Opinion on plaintiff's Motion for Preliminary Injunction, 1956 Trade Cases par. 68,244 (E.D.Mo.1956), was filed and entered in this Court on January 13, 1956. It provided that if the merger was completed, then:

"(1) that title to all assets acquired from Kinney by Brown by the merger be vested in a subsidiary corporation of Brown;
"(2) that the subsidiary corporation shall have independent management under the control of a board of directors, none of which members shall be on the boards of directors of Brown or any of Brown's other subsidiaries;
"(3) that all assets acquired from Kinney, together with the net earnings of Kinney subsequent to the merger, shall be retained by Kinney, and shall be at all times identifiable as assets of the subsidiary corporation, and none such assets shall be intermingled with Brown's assets;
"(4) that all the stock in the subsidiary corporation shall be held by Brown, other than qualifying shares for the board of directors, and shall not be hypothecated or encumbered in any manner;
"(5) that any leases now held by Kinney if renewed shall be renewed in the name of the subsidiary corporation, and any new leases negotiated for the subsidiary (Kinney) outlets shall be in the name of the subsidiary corporation, and all such leases shall be and remain the property of the subsidiary corporation;
"(6) that no subsidiary (Kinney) retail outlet shall be closed for reasons of competition with any Brown controlled retail outlet;
"(7) that no factory of the subsidiary (Kinney) corporation shall be closed or any of its production taken over by Brown because of competitive reasons with Brown; and
"(8) that on formation of the subsidiary (Kinney) corporation it shall enter its appearance in this cause and make itself subject to the jurisdiction of the Court in this cause."
[Judge Hulen's order, entered March 13, 1956, follows above Opinion except it details the mechanics of performance.]
[5] The 3 top shoe manufacturers, viz., International, Endicott-Johnson and Brown (including Kinney), produced about 17% of the nation's total shoe production in 1957.

The top 24 manufacturers produced about 35% of the nation's total and thus the top 3 produced about ½ of the top 24's production for 1957.
When the top 4 (which adds General Shoe Corp.) is considered, they produced about 23% of the total shoe production and had about 65% of the top 24's production.
[6] 26 Stat. 209, 15 U.S.C.A. §§ 1-7. For a history of events leading to its passage, see United States v. Trans-Missouri Freight Ass'n, 166 U.S. 290, 319, 17 S. Ct. 540, 41 L.Ed. 1007.
[7] 38 Stat. 730, 15 U.S.C.A. §§ 12-27. Also the Federal Trade Commission Act, 38 Stat. 717, as amended, 15 U.S.C.A. § 41 et seq.
[1] See Note 1 on page 723.
[8] The reason the Court has used the "10,000 or more" population figure is because Kinney stores are located in cities of such size and the evidence in this case dealt with such sized cities.
[9] And on May 1, 1958, the following retail outlets were in operation:

Brown Franchise Stores 647
Regal Outlets 92
Wohl Plan Accounts 208
Wohl Leased Departments (In 457
 243 stores)
 ____
 Total 1404
Kinney 416
 ____
 Combined Total 1820

[10] There were over 70,000 stores selling shoes but the census department classifies a shoe store as one that has over 50% of its gross receipts entirely from the sale of shoes. The 22,000 figure is determined as retail shoe stores having such percentage of sales.

The six firms' percentages of nation's total retail shoe store operation for 1956:

 Melville Shoe Co. 4.3%
 Shoe Corp. of America 3.8
 *Brown (not including franchise
 stores) 3.8
 Endicott-Johnson 2.4
 General Shoe 2.3
 Edison (not a manufacturer) 1.3
 ____
 Total 17.9
 International Shoe, the nation's largest
shoe manufacturer (but one of the 13
largest firms above considered) had only
0.5% of the nation's total.
 *If Brown and Kinney were combined,
Brown's percentage would be 5.7% and
would raise the above total to 19.8%.

[11] Of the top 12 firms in the nation in 1956 (considering Brown and Kinney combined) 6 had less than 91.1 million dollar sales each, per year. The 6 largest ranged from 126.1 to 266.8 million each, per year. The smallest of these 12 had 16.4 million whereas Brown and Kinney combined would have had 219.1 million.
[12] See footnote 5, 10, and text paragraphs supported thereby.
[13] One of defendants contentions was its necessity to compete with other larger companies. Their motives are not a determining factor, however, for in United States v. E. I. du Pont, 353 U.S. 586, 607, 77 S.Ct. 872, 884, 1 L.Ed.2d 1057 the court stated:

"Similarly, the fact that all concerned in high executive posts in both companies acted honorably and fairly, each in the honest conviction that his actions were in the best interests of his own company and without any design to overreach anyone, including du Pont's competitors, does not defeat the Government's right to relief. It is not requisite to proof of a violation of § 7 to show that restraint or monopoly was intended." See also Bethlehem Steel, supra, 168 F. Supp. loc. cit. 617.
[4] See p. 724, ante.