**COPPERWELD CORPORATION, a Pennsylvania Corporation, Plaintiff,**
**and**
**United Steelworkers of America, AFL–CIO, Plaintiff-Intervenor,**

v.

**IMETAL, a French Corporation, Defendant.**

Civ. A. No. 75–1119.

United States District Court, W. D. Pennsylvania.

Oct. 23, 1975.

Frank L. Seamans, John H. Morgan, Eckert, Seamans, Cherin & Mellott, Carl B. Frankel, Pittsburgh, Pa., for plaintiff-intervenor.

J. Tomlinson Fort, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., Robert W. Sweet, Skadden, Arps, Slate, Meagher & Flom, New York City, for defendant.

## OPINION

JOHN L. MILLER, District Judge.

### INTRODUCTION

For whatever reasons, great interest rarely descends upon the fields of combat—the nation's courtrooms—when domestic corporations seek to resolve their differences. Aided by an interested public and the presence of a foreign combatant the present day's continuing saga of corporate warfare has brought before this Court what might appropriately be termed an epic battle.

On September 4, 1975, Societe Imetal (Imetal) advertised in the New York

Times and the Wall Street Journal its Offer to Purchase all outstanding shares of the common stock of Copperweld Corporation (Copperweld) at $42.50 net per share and all outstanding five per cent convertible debentures due December 1, 1979, at $1,517.86 net per $1,000 principal amount of debentures. There are almost 2½ million shares of Copperweld common stock outstanding and $4½ million principal amount of debentures outstanding. If Imetal were completely successful in making this tender offer the price for the securities would run well over $110 million.

On September 5 this novel suit, officiously labelled a "Tender Offer" case in some business circles, was commenced to block consummation of the transaction. In essence Copperweld seeks to enjoin the attempted acquisition on the ground that Imetal has violated the securities laws through the communication of its tender offer and that the acquisition, if realized, would violate the antitrust laws.

## BACKGROUND

### Parties

Plaintiff Copperweld is a publicly held corporation organized under the laws of the Commonwealth of Pennsylvania with its principal place of business in Pittsburgh, Pennsylvania. Its common stock and debentures are listed and traded on the New York and PBW Stock Exchanges. Copperweld manufactures specialty metal products which can be classified into three major groups: (1) alloy steel, (2) tubing, and (3) bimetallic products.

Plaintiff-Intervenor United Steelworkers of America, AFL–CIO (Union) is a national labor organization which is headquartered in Pittsburgh, Pennsylvania. It is the collective bargaining representative of all the production and maintenance workers employed by Cop-

perweld at its Glassport (Pennsylvania), Warren, and Shelby (Ohio) plants.

Defendant Imetal is a corporation organized under the laws of France as a holding company with its headquarters in Paris. Formerly named Le Nickel it was for many years an operating company which engaged primarily in the business of mining nickel ore. Le Nickel at that time had two major subsidiaries, Pennarroya and Mokta, both of which mined and processed other minerals and metals. Mainly because Le Nickel wanted to lessen its dependency on nickel and needed capital for diversification and other business-related purposes, it decided to reorganize into a holding company which it did in 1974 after a transfer of its entire Nickel Division to a new company, Societe Metallurgique Le Nickel-SLN (SLN) and the sale of half of its holdings in SLN to Societe Nationale des Petroles d'Aquitane (Aquitane), a French petroleum company. Most of the proceeds from this sale to Aquitane were allocated for diversification and investment in the United States. A vastly held public company, Imetal's shares are traded on the Paris Bourse, France's principal stock exchange. Today it engages principally in mining and mineral processing. It has subsidiaries and affiliates throughout the world, some of which enable Imetal to conduct its business as "a major integrated industrial concern.[1]" Imetal has no processing facilities in the United States.

### Selecting Copperweld

In conducting a search for the kind of American firm Imetal wanted it retained New Court Securities Corporation (New Court) to help with the investigation. Copperweld was one of 39 companies under consideration in November of 1974. Imetal's Managing Director, Bernard de Villemejane, bore the primary responsibility for finding a suitable firm. During the course of the investi-

---

[1]. Exhibit G attached to the Schedule 13D filed with the Securities and Exchange Commission (SEC) pursuant to section 13(d) of the Securities Exchange Act of 1934 (PX 314).

gatory effort the American consultants were supplied with memoranda containing policies, objectives, corporate structure, financial and product information, etc. so that the company selected would in every possible way be compatible with Imetal's operations.[2]

In February of this year the search had narrowed to 11 with Copperweld's name still in the running. Mr. Harold Tanner, a representative of New Court, telephoned plaintiff's President, Phillip H. Smith, expressing a desire to meet with him concerning Imetal's possible interest. Mr. Smith, not seeing any business advantage for Copperweld, declined to meet with him.[3]

In the spring many more companies were considered and another investment firm, Kuhn Loeb & Co. (Kuhn), was retained to assist New Court. By early summer the defendant had whittled the list to three and, because defendant was giving each a very hard look at this stage, they were assigned the code names of Bread, Butter, and Garlic.[4] In the latter part of June Villemejane was decidedly favoring Bread (Copperweld) and thereafter initiated an all out effort to uncover whatever knowledge he could about the company.

In August the plans were made by Imetal in New York with its legal and investment advisors on how to properly execute the tender offer. Contact by phone was again made on August 29 between Alvin E. Friedman, a Kuhn representative, and Howell A. Breedlove, a Copperweld Vice President, which resulted in a meeting between the parties on September 2, 1975. Copperweld's reaction to the proposal was again negative and the fighting began with vigor.

### Prior Proceedings

Pursuant to Rule 65(b) of the Federal Rules of Civil Procedure this Court on September 5 granted Copperweld's request for a temporary restraining order which had been simultaneously filed with a verified complaint [5] and a motion for a preliminary injunction. After rather extensive expedited discovery by both sides a hearing on plaintiff's motion for preliminary injunction commenced on September 15, at which time plaintiff United Steelworkers of America (Union) was permitted to intervene.[6] After six days of testimony and reception of scores of exhibits we concluded the hearing on September 22. Briefs from all parties were submitted on September 29 with oral argument concluding the formalities on October 1.[7]

### APPLICABLE LAW

#### Substantive

The antitrust issues raised by the complaint involve Section 7 of the Clay-

---

2. *See* PX 14; 276; 378.

3. PX 317.

4. Code names are appropriate for preserving the element of surprise in the event the actual target is unfriendly as well as preventing a "leak" and its attendant "inside trading" implications. (*See* TR 718, 722.)

5. The complaint as amended lists ten counts upon which probable liability is predicated. Counts I through III concern the antitrust issues while Counts IV through X pertain solely to asserted violations of the Securities Exchange Act of 1934 (Exchange Act). Defendant has counterclaimed (as amended) on six counts under the Exchange Act and the Pennsylvania. Business Corporation Law. But for Court VI, which seeks plaintiff's shareholder list, Imetal is not pressing its counterclaims at this time.

6. Defendant reserved the right to challenge the Union's standing to intervene (TR 3) which it eventually exercised at p. 4 of its Post-Hearing Memorandum. We decline to so rule, *see International Association of Heat and Frost Insulators v. United Contractors Association, Inc.,* 483 F.2d 384 (3 Cir. 1973), however, because Plaintiff-Intervenor's legal theories virtually track the antitrust contentions of Copperweld, the Court *is not disposed to consider their positions individually.*

7. Actually the record was reopened on Friday, October 3 for the reception of evidence pertaining to the one counterclaim Imetal desired to pursue, however a conference in chambers produced a consent order which disposed of that issue. We also wish to note that references to the *argument record* as opposed to the *trial record* (TR) will be designated AR.

ton Act, 15 U.S.C. § 18, and Section 1 of the Sherman Act, 15 U.S.C. § 1. The purported securities violations deal with Sections 9(a)(2), 10(b), 13(d), 14(d) and 14(e) of the Securities Exchange Act of 1934 (Exchange Act), as amended by the Williams Act of 1968,[8] 15 U.S.C. §§ 78i(a)(2), 78j(b), 78m(d), 78n(d) and 78n(e).[9] Jurisdiction for this suit obtains from 15 U.S.C. §§ 26, 78aa and 28 U.S.C. § 1337.

### Procedural

Before undertaking the real task engendered by this suit the Court wishes to clarify the preliminary injunction standards by which plaintiff's case will be measured.

 Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, this Court is empowered to enjoin "threatened loss or damage by a violation of the antitrust laws" in the same manner and under the same principles as any other action for which such relief is sought.[10] The Court is well aware of the requirements plaintiff must meet to obtain a preliminary injunction in this jurisdiction. Only last year the test was *again* spelled out rather clearly by the Third Circuit:

As a prerequisite to the issuance of a preliminary injunction the moving party must generally show: (1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured *pendente lite* if relief is not granted to prevent a change in the status quo. *A. L. K. Corp. v. Columbia Pictures Industries, Inc.,* 440 F.2d 761, 763 (3 Cir. 1971).

*Delaware River Port Authority v. Transamerican Trailer Transport, Inc.,* 501 F.2d 917, 919–920 (3 Cir. 1974). Writing for the Court Judge Rosenn also pointed to additional criteria that should, when relevant, be considered by the district court. Added to the above are ". . . (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest." *Delaware River, supra,* at 920. (Footnote omitted.)

In view of *Delaware River* and other Third Circuit cases [11] which have addressed the standards by which a preliminary injunction should issue, we were initially disturbed when plaintiff advanced what the Court considers to be a less stringent test that has been adopted by a line of cases in the Second

---

8. Act of July 29, 1968, Pub.L. No. 90–439, 82 Stat. 454, amending 15 U.S.C. §§ 78m–78n (1964) and codified as amended, 15 U.S.C. §§ 78m(d), (e), 78n(d)–(f) (1970).

9. *Copperweld also asserts violations of Rules 10b–5 and 13D promulgated by the SEC pursuant to §§ 78j(b) and 78m(d) respectively. See* 17 C.F.R. §§ 240.10b–5 and 240.13d–1.

10. 15 U.S.C. § 26 provides in part:

Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against *threatened* loss or damage by a violation of the antitrust laws . . . when and under the same conditions and principles as injunctive relief against *threatened* conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction im-

providently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue . . . . (Emphasis added.)

Of course injunctive relief is also available when a tender offer is pursued in violation of the Exchange Act. *Sonesta International Hotels Corp. v. Wellington Associates,* 483 F.2d 247, 250 (2 Cir. 1973) ; *see Butler Aviation International, Inc. v. Comprehensive Designers, Inc.,* 425 F.2d 842 (2 Cir. 1970) ; *Elco Corp. v. Microdot Inc.,* 360 F. Supp. 741 (D.Del.1973).

11. *See, e. g., Scooper Dooper, Inc. v. Kraftco Corp.,* 460 F.2d 1204 (3 Cir. 1972) (per curiam) ; *A. L. K. Corp. v. Columbia Pictures Industries, Inc.,* 440 F.2d 761 (3 Cir. 1971) ; *Allis-Chalmers Manufacturing Co. v. White Consolidated Industries, Inc.,* 414 F.2d 506 (3 Cir. 1969) ; *Graham v. Triangle Publications, Inc.,* 344 F.2d 775 (3 Cir. 1965) (per curiam) ; *Industrial Electronics Corp. v. Cline,* 330 F.2d 480 (3 Cir. 1964).

Circuit. This different standard, though recognized in earlier decisions,[12] was succinctly set forth in *Stark v. New York Stock Exchange*, 466 F.2d 743, 744 (2 Cir. 1972)(per curiam) as follows:

> Appellants assumed the burden of demonstrating *either* a combination of probable success and the possibility of irreparable injury *or* that they had *raised serious questions going to the merits* and that the balance of hardships tipped sharply in their favor. (Emphasis added.)

In later decisions the Second Circuit has indicated that this relaxed standard is particularly well-suited to gauging the propriety of a preliminary injunction in a tender offer situation:

> Recently we have emphasized the importance of demonstrating on a preliminary injunction motion the presence of serious questions going to the merits which warrant further investigation and trial.
>
> \* \* \* \* \* \*
>
> In the instant case, the magnitude and far reaching consequences of the alleged violations of the antitrust and securities laws are such that, in our view, the public interest requires the application of a like standard.

*Gulf & Western Industries, Inc. v. Great A & P Tea Company, Inc.*, 476 F.2d 687, 692 and 693 (2 Cir. 1973); *accord Sonesta International Hotels Corp. v. Wellington Associates*, 483 F.2d 247 (2 Cir. 1973).

■ Normally, in the absence of the lesser standard being *expressly* adopted by the Third Circuit the Court would be reluctant to permit Copperweld to avail itself of same. However, we have reason to believe that, should the Circuit have occasion to rule on the matter in the context of a case such as the one before us,[13] it would embrace the less stringent criteria. In *Delaware River, supra*, a case in no way factually and legally similar to ours, Judge Rosenn, after concluding that the "likelihood of success" test was not met, went on to say at p. 923 that a lower court may not abuse its discretion in granting an injunction ". . . even though plaintiffs did not demonstrate as strong a likelihood of ultimate success as would generally be required [citing *Gulf & Western*]". Moreover the Third Circuit has cited the *Gulf & Western* and *Sonesta* decisions with apparent approval in at least one case involving a tender offer, *Ronson Corp. v. Liquifin Aktiengesellschaft*, 483 F.2d 846, 849–51 (3 Cir. 1973)(per curiam). *See Elco Corp. v. Microdot Inc.*, 360 F.Supp. 741, 746–47 (D.Del. 1973). In light of the above remarks and because plaintiff has not shown a likelihood of success in our judgment, we shall ponder only whether serious questions going to the merits have been adequately shown.[14]

## ANTITRUST CLAIMS

Before discussing the merits of the antitrust claims the Court wishes to summarily dispose of two threshold arguments asserted by defendant.

■ First it is charged that Copperweld has failed to define the relevant lines of commerce and, because "[d]etermination of the relevant market is a necessary predicate to a finding of a violation of the Clayton Act

---

12. *See, e. g., Checker Motors Corp. v. Chrysler Corp.*, 405 F.2d 319, 323 (2 Cir. 1969); *Unicon Management Corp. v. Koppers Co.*, 366 F.2d 199, 205 (2 Cir. 1966); *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2 Cir. 1953).

13. Here we refer to cases of a nature so rife with factual and legal complexities that they are just not readily amenable to astute preliminary adjudication.

14. While the Court is cognizant of the fact that Imetal raises no objection to our consideration of the lesser standard (AR 135) we feel that, in view of the likelihood that today's decision will undergo review, the appellate court should know why we deviated from such firmly-entrenched principles.

. . .", *United States v. E. I. du Pont de Nemours & Co.,* 353 U.S. 586, 593, 77 S.Ct. 872, 877, 1 L.Ed.2d 1057 (1957), Imetal contends that this portion of the case is precluded. In support of this position defendant cites the test set forth in *Brown Shoe Co., Inc. v. United States,* 370 U.S. 294, 325, 82 S. Ct. 1502, 8 L.Ed.2d 510 (1962) along with the ruling of Judge Fisher in *Ronson Corp. v. Liquifin Aktiengesellschaft,* C.A. 785–73 (D.N.J.1973). The problem with defendant's position is that Copperweld has introduced evidence, as discussed below, which supports a finding of its relevant markets. This fact renders *Ronson* wholly inapplicable because in that case the plaintiff introduced nothing to support its market participation.[15] Nor can we *strictly* apply the test of *Brown Shoe* because, considering the nature of this proceeding, the factors therein enumerated were designed we think for proving a Section 7 violation on the merits.[16]

■ Secondly it is charged that Copperweld has no standing to raise these antitrust questions because it has made no showing of threatened competitive harm to itself. From a purely competitive standpoint this acquisition most probably will not hurt plaintiff. However this is not a Section 4 Clayton Act case whereby only one who is injured in his business is permitted to seek treble damages. 15 U.S.C. § 15. The instant suit is being brought under Section 16, 15 U.S.C. § 26, which permits *any* corporation to sue for injunctive relief against threatened loss. Plaintiff has alleged threatened irreparable harm, to wit, possible action by the government for divestiture. Moreover in discussing the legislative history of Section 7 then Chief Justice Warren noted that the statutory objective was to protect ". . . *competition,* not *competitors*

. . . ." *Brown Shoe, supra,* at 320, 82 S.Ct. 1502. We believe the plaintiff has standing to raise the issues herein.

### COUNT I—Potential-Competition Theory

Copperweld's initial theory that the acquisition would violate the antitrust laws rests on Section 7 of the Clayton Act, 15 U.S.C. § 18. It provides in pertinent part:

No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, *where in any line of commerce* in any section of the country, the effect of such acquisition *may* be *substantially to lessen competition,* or to tend to create a monopoly. (Emphasis added.)

One of the first cases involving judicial construction of Section 7 following the 1950 amendment was the celebrated *Brown Shoe Co., Inc. v. United States, supra.* In discussing the legislative history of § 7 the late Chief Justice Warren, writing for the majority, observed that Congress was fearful of the increasing tendency toward concentration in the American economy. *Id.* at 315, 82 S.Ct. 1502. He then goes on to list eight factors which Congress discussed in redrafting § 7, six of which we deem worth mentioning in the context of this case. These six points can be summarized as follows:

(1) Section 7 was intended to apply to *any* merger tending to lessen competition;

(2) it was designed to arrest such a merger in its *incipient* stages;

---

15. The adverse ruling by Judge Fisher probably did not disturb plaintiff anyway since the preliminary injunction was granted on securities grounds and upheld on appeal. 483 F.2d 846 (3 Cir. 1973).

16. In *Brown Shoe Co., Inc. v. United States,* 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), *aff'g* 179 F.Supp. 721 (E.D.Mo. 1959), the complaint was filed *four years* prior to the lower court's determination of the alleged violations.

(3) the statute, though remedial in purpose, was not intended to attack *all* mergers;

(4) Congress neither defined the standards nor adopted any tests by which the *effects* of a merger on competition are to be determined;

(5) however, it did indicate that the merger must be examined in the context of its *particular industry; i. e.,* with an awareness of industry trends toward domination, concentration, fragmentation, market entries, barriers to entry, etc.; and

(6) in light of the statutory language any assessment of a merger's effect must be concerned only with *probabilities,* not certainties.[17]

■ The anticompetitive effects wrought by the merger in *Brown Shoe* were pursuant to classic horizontal and vertical arrangements.[18] Since most, if not all, sizeable mergers are inherently suspect under § 7, especially where the acquiring firm engages in business activities similar or related to the acquired firm, we five years later witnessed the birth of the "product extension" merger. *FTC v. Procter & Gamble Co.,* 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967). In this case Procter & Gamble (P & G), a diversified manufacturer of household cleaning items, acquired Clorox Chemical Co., a leading liquid bleach producer. The merger had no vertical characteristics yet it could not be classified as truly horizontal since P & G, not being a manufacturer of liquid bleach, was not a competitor with Clorox in that particular line of commerce. The Federal Trade Commission argued that the takeover enabled P & G to *extend* its already

similar product line and, because of other relevant market factors, tended to lessen competition. By agreeing with the government the Supreme Court, in holding § 7 to bar certain acquisitions involving noncompetitors, also gave impetus to what is now called the "potential-competition doctrine."

In Count I, plaintiff alleges that it manufactures and sells eight major products which constitute separate lines of commerce in the United States. Since these products are sold in markets alleged to be oligopolistic it is contended that defendant, by entering this market through acquisition, would be violating the "potential-competition doctrine" that has evolved from judicial decisions construing Section 7 of the Clayton Act. In our view some background on this doctrine would be a beneficial prelude to our discussion of this claim.

■ The emergence of the potential-competition doctrine as we know it today is comparatively recent. True, it was probably given birth over a decade ago, *see United States v. El Paso Natural Gas Co.,* 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964), but it really attained stature in the seventies with the Supreme Court's decision in *United States v. Falstaff Brewing Corp.,* 410 U.S. 526, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973). Because it had been evident that § 7 was applicable to *all* mergers that *may* substantially lessen competition the economic alignments between the acquiring and acquired firms no longer mattered.[19] After *Procter & Gamble* the reasoning behind the doctrine was clear: an enterprising concern which gains market entry by acquisition may, because of its success in similar or

---

17. *Id.* at 317–23, 82 S.Ct. 1502.

18. A horizontal arrangement is one characterized by similar functions in the manufacture or sale of comparable products. The vertical arrangement is marked by a customer-supplier relationship between companies. *Id.* at 323, 334, 82 S.Ct. 1502.

19. The theory of potential competition has been applied to the three major types of acquisition: *see United States v. Falstaff,* 410 U.S. 526, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973) (horizontal); *Ford Motor Co. v. United States,* 405 U.S. 562, 92 S.Ct. 1142, 31 L.Ed.2d 492 (1972) (vertical), and *FTC v. Procter & Gamble,* 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967) (product extension).

related fields and financial resourcefulness, become such a dominant force in the new market that prevailing conditions could be upset thus effecting competition detrimentally; however if that same firm would enter the market as a new entity by internal expansion it could well cause a beneficial effect on competition.

A "potential competitor" was aptly described in *United States v. Penn-Olin Chemical Co.*, 378 U.S. 158, 174, 84 S.Ct. 1710, 1719, 12 L.Ed.2d 775 (1964):

> The existence of an aggressive, well equipped and well financed corporation engaged in the same or related lines of commerce waiting anxiously to enter an oligopolistic market would be a substantial incentive to competition which cannot be underestimated.

Thus one who is not competing, but could be competing, may cause a procompetitive effect as the Court in *Falstaff*, 410 U.S. at pp. 531–32, 93 S.Ct. at p. 1100 observed:

> Suspect also is the acquisition by a company not competing in the market but so situated as to be a potential competitor and likely to exercise substantial influence on market behavior. Entry through merger by such a company, although its competitive conduct in the market may be the mirror image of that of the acquired company, may nevertheless violate § 7 because the entry *eliminates a potential competitor exercising present influence on the market.* (Emphasis added.)

■ The Supreme Court, not having made its position clear concerning application of the doctrine in *Procter & Gamble,* left no doubt with the *Falstaff* decision. In this case defendant, the nation's fourth largest beer producer operating regionally, acquired a local concern in the northeast sector of the country so that it could go national. Since *Falstaff* had not competed in that geographic market the government contended it ". . . was a potential competitor so situated that its entry by merger rather than *de novo* violated § 7." 410 U.S. at 532, 93 S.Ct. at 1100. The district court, finding that Falstaff had *no intention* of entering that market *de novo,* concluded that it was not a potential competitor and dismissed the complaint. The Supreme Court in reversing that decision saw error in the district court's assumption that, but for *de novo* entry, one could not be deemed a potential competitor. *Id.* Writing for the majority Justice White then goes on to articulate what has become the second criterion by which it can be determined whether one is a potential competitor under § 7:

> [T]he District Court failed to give separate consideration to whether Falstaff was a potential competitor in the sense that it was so positioned on the *edge of the market* that it exerted *beneficial influence* on competitive conditions in that market. *Id.* at 532–33, 93 S.Ct. at 1100. (Emphasis added.)

In other words if one "on the fringe" [20] of the market is exerting a discernible *procompetitive* influence but is taken away by acquisition, the resultant effect is anticompetitive. Justice Marshall put it most clearly:

> The perceived potential entrant exerts a procompetitive effect because companies in the market *perceive* it as a potential entrant. The companies in the market may entertain this perception whether the perceived potential entrant is *in fact* a potential entrant or not. Thus, a firm on the fringe of the market may exert a procompetitive effect even if it has no intention of entering the market, so long as it seems to those within the market that it may have such an intention. *Id.* at 564, 93 S.Ct. at 1116 (emphasis in original). (Concurring opinion.)

---

20. Justice White prefers to speak of the "on-the-fringe" entrant, *see Falstaff, supra,* at 534 n. 13, 93 S.Ct. 1096, while Justice Marshall refers to the same entity as the "perceived" entrant, *id.* at 559, 93 S.Ct. 1096.

It is with this view of the law that we turn to the evidence.

The relevant geographical market for the eight product lines asserted in this claim is the United States. At this stage of the litigation the Court is satisfied that Copperweld has established eight lines of commerce or product markets from which we can preliminarily assess whether this acquisition would run awry of Section 7. As collectively viewed the evidence does point to the various characteristics—unique features, industry coding, customers' demands, sales effort—which make these eight products separate and identifiable.[21] In sum we believe that plaintiff meets in an abbreviated fashion the test enunciated in *Brown Shoe, supra*, 370 U.S. at 325, 82 S.Ct. 1502.

The evidence also shows that these eight markets in which Copperweld competes are oligopolistic, *i.e.*, there are relatively few competing sellers thus competition is weak and tends toward concentration. Copperweld is a comparatively small concern but competes actively with giants such as United States Steel, Republic Steel, Texas Instruments, etc. because of its expertise in the specialty metals field.

Because of the nature of the industry in which it operates and the concentrated markets in which it competes Copperweld contends that Imetal is a prime candidate for the title of "potential competitor". Thus it is argued for Imetal to enter these markets by acquisition of an existing competitor it will of necessity eliminate itself as a potential competitor and thereby cause a lessening of competition in those relevant markets.

Being fully aware of the intricate preparation that is necessary to establish relevant markets [22] the Court believes leniency is warranted on this issue. We further believe that Copperweld has produced sufficient evidence to indicate that Imetal is aggressive, well-financed, and rich in resources with the desire to become active in Copperweld's markets by acquisition.[23] It is also rather clear that Imetal, through at least part of its operating holdings, is engaged in similar or related lines of commerce and has the capacity to enter Copperweld's markets on its own.[24]

As we view the law there are two distinct ways in which Copperweld can prove that this acquisition will violate § 7 under the potential competition theory:

(1) if Imetal is not permitted to enter by acquisition then it will enter *de novo*; and/or

(2) is Imetal a "perceived" or "on-the-fringe" likely potential competitor as viewed by those already in the market.

21. PX 396; TR 200–12; TR 261–89; TR 591–93; DX 1, p. 28. As measured by sales the general condition of, and plaintiff's participation in, each product market is summarized as follows: (1) DOM tubing, plaintiff has 40% share with three major competitors; structural tubing 12%, third largest; copper on steel ground rods 60% with one major competitor; bimetallic wire (communications) 61% with three major competitors; bimetallic wire (telephone) 25% with three major competitors; bimetallic wire (railroad signals) 70% with one major competitor; aluminum clad steel product, plaintiff is the only domestic producer; alloy steels 17% with five major competitors (cold rolled), 7% with five major competitors (hot rolled). While it is true that the record lacks facts concerning interchangeability and cross-elasticity of demand we note that one of defendant's own documents, prepared while in the process of analyzing Copperweld as a prospective target, indicates plaintiff to be a world leader in bimetallic wires. *See* PX 118.

22. Indeed all of the economic experts in this case agreed that more time is needed to do comprehensive and accurate market studies. Unlike the supply markets discussed in Count II defendant had difficulty challenging plaintiff's statistics here.

23. PX 314; Ex. G; PX 228; PX 273; PX 274; TR 377–78; TR 45–7; PX 14, PX 167; PX 276; TR 599.

24. PX 14; PX 311, p. 20; TR 307; PX 390; PX 391; TR 59; TR 165; TR 263; TR 266; TR 825; PX 393; PX 394; PX 398; PX 399; PX 276; PX 284; TR 179–99; TR 72–89; TR 95–127.

The Court does not believe any party would dispute the statement that it is difficult for plaintiff to prove that defendant will enter *de novo* if denied the opportunity to acquire. *See United States v. Marine Bancorporation, Inc.,* 418 U.S. 602, 624, 94 S.Ct. 2856, 41 L. Ed.2d 978 (1974). There is certainly no evidence in this record to support such a suggestion. However, as the majority opinion in *Falstaff* points out at 410 U. S. 533, 93 S.Ct. 1096, 1101, a showing that the acquiring firm is the "most likely entrant" and exerts "considerable influence on the market" (quoting from *Procter & Gamble*) can be readily susceptible to objective proof:

> The specific question with respect to this phase of the case is not what Falstaff's internal company decisions were but whether, given its financial capabilities and conditions in the . . . market, it would be reasonable to consider it a potential entrant into that market.

After briefly discussing why it was possible for beer competitors in that particular market to know of Falstaff's presence the Court goes on to instruct:

> The District Court should therefore have appraised the economic facts about Falstaff and the . . . market in order to determine whether in any realistic sense Falstaff could be said to be a potential competitor on the fringe of the market with likely influence on existing competition. *Id.* at 533–34, 93 S.Ct. at 1101.

It is clear that for plaintiff to succeed it would have to prove that defendant is a "most likely entrant" and a "perceived" entrant with respect to these markets. In our opinion the only way to ascertain that likelihood would be to fully examine market conditions and the specialty metals industry, its history, trends etc. This obviously could not be

done in the time allowed. If we are to follow Justice White's mandate, *i.e.*, appraise the economic facts in realistically deciding whether Imetal is an "on-the-fringe" potential competitor, the Court must have a fuller record.

■ Therefore we conclude that on the basis of the evidence presented regarding Count I plaintiff has sufficiently demonstrated a serious question going to the merits.

### COUNT II—*Vertical Foreclosure*

■ The complaint reveals this Count to be originally premised on Section 7 of the Clayton Act and Section 1 of the Sherman Act. However in view of the legal memoranda submitted we are persuaded that the conspiracy element is solely being pressed in Count III.

The thrust of this claim is that, because Imetal is a producer of certain raw materials which Copperweld consumes, the effect of the acquisition would be to capture plaintiff as a customer. Since plaintiff presently purchases most of its supplies from domestic sources the effect, it is argued, would be to substantially lessen competition.

Plaintiff has identified six separate supply markets which it alleges would be affected by the acquisition. They are copper, nickel, chrome, molybdenum, aluminum and flat rolled steel. The purported amount of participation in these markets by Copperweld ranges from 2% (molybdenum) to 12.9% (flat rolled steel).[25]

Copperweld contends that such participation is of a sufficient degree to merit a violation of § 7 *if* it were forced to purchase these supplies solely from Imetal's operations. The plaintiff also asserts that there is sufficient evidence to show defendant's capacity and desire to have it as a customer.

---

25. Plaintiff's evidence indicates that for 1974 Copperweld had the following shares of these markets: copper (9.9%); nickel (7.4%); chrome (2.2%); aluminum powder (3.8%); molybdenum (2%); and flat rolled steel (12.9%). PX 398; PX 399; TR 179–98. Lead was pleaded but abandoned while flat rolled steel and chrome were added at the hearing.

This claim cannot be sustained because we do not believe the evidence demonstrates that Imetal intends to force Copperweld to purchase supplies from its holding concerns or affiliates. Unlike the question posed in Count I we are asked here to look into a crystal ball for guidance. While it is fact that defendant has the capacity to supply plaintiff's supply needs there is little else plaintiff can point to in support of this allegation. Granted, there is some testimony to support this *suspicion*[26] but it is the premise that wallows in speculation. Moreover, in view of direct evidence to the contrary,[27] we cannot say, without more, that Copperweld has raised a serious and substantial question meriting further investigation.

There is another reason why plaintiff cannot prevail here. Unlike the markets discussed in Count I—where Copperweld is generally recognized as one of the leaders—the supply markets in which plaintiff participates encompass more and larger purchasers. Thus Copperweld has comparatively smaller shares. The market percentages provided by Copperweld, being more susceptible to challenge, were effectively rebutted by defendant. Imetal introduced evidence showing Copperweld's market participation in the relevant supply markets to be much smaller and in what we believe to be a more credible manner. Calling James C. Burrows, an economist with specialization in the metals industry, for the purpose of establishing plaintiff's share of the relevant supply markets, the defendant has shown Copperweld's participation for 1974 to be: copper (.35%); aluminum (.06%); molybdenum (1.39%); nickel (.63%); and chrome (.64%).[28]

In our opinion defendant has presented more credible evidence because Burrows is an expert in the field and computed his statistics from industry booklets put out by the federal government. For example plaintiff's controller, Donald E. Mitchell, based his 7.4% figure on nickel used only for certain alloy steels while Burrows confirmed that the relevant market should encompass *all* types of nickel. This is because nickel in various forms can be used for the same end products and has a broad range of substitution.[29] He thus concluded that plaintiff's share of the relevant nickel market was only 0.63%.

Based on similar testimony from Mr. Burrows we do not believe that it is necessary to discuss each of these markets. We are convinced that a more accurate picture of the relevant supply markets was painted by defendant and the resultant impact of any foreclosure of those markets by the defendant would be minimal. As the Supreme Court has stated in *Brown Shoe* ". . . foreclosure of a *de minimus* share of the market will not tend 'substantially to lessen competition'." 370 U.S. at 329, 82 S. Ct. at 1526. We rely on the expert opinions of both Mr. Burrows and Professor Merton J. Peck that such an arrangement would not have a significant effect on the relevant supply markets.[30]

### COUNT III—Conspiracy

The final antitrust claim is also predicated on § 7 Clayton and § 1 Sherman.[31] It is similar to Count II

---

26. The testimony of Dr. David Gols, plaintiff's expert, indicates that it is sound economics and good business practice for manufacturing companies to gain control of their own raw material sources. (TR 613–18).

27. Imetal's Chairman testified that there is no such plan. (TR 366.)

28. DX 19; TR 741–59. There is no evidence to even indicate that Imetal sells flat rolled steel.

29. TR 754.

30. TR 759; TR 814–15.

31. 15 U.S.C. § 1 provides in part:
Every contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . .

with the additional charge of conspiracy. Briefly it specifically involves the association between an American company, Amax, Inc., and Imetal. Amax, which owns a 10.6% interest in defendant, is one of the largest copper refiners in the United States and supplies other raw materials which plaintiff consumes in manufacturing its products.

The theory here is that Imetal and Amax (along with other of defendant's affiliates and subsidiaries) have agreed that, in the event the acquisition is effected, the defendant would assure Amax the raw material orders of Copperweld. This arrangement would in turn cut off plaintiff's present suppliers and ultimately result in a trade restraint violative of § 1. It is also contended that competition would be substantially lessened thereby violating § 7 of the Clayton Act.

The evidence presented to support such a charge is, to say the least, meager. Copperweld has merely shown that Imetal is the focal point of a complex web of corporate interrelationships.[32] There has also been testimony about joint ventures, interlocking directorates, common ownership and control between Imetal and some of its numerous subsidiaries and affiliates.

■ The evidence presented to show the basis for a conspiracy is clearly inadequate. *See Daily Press, Inc. v. United Press International*, 412 F.2d 126, 134 (6 Cir. 1969), *cert. denied*, 396 U.S. 990, 90 S.Ct. 480, 24 L.Ed.2d 453 (1969); *Texasgulf, Inc. v. Canada Development Corp.*, 366 F.Supp. 374, 407 (S.D.Tex. 1973). Moreover we find no evidentiary support for plaintiff's contention that Imetal has conspired for the purpose of foreclosing Copperweld's supply markets.

Common ownership and control does not *ipso facto* impute a violation of the federal antitrust laws. *Kiefer Stewart Co. v. Joseph E. Seagrams &*

*Sons, Inc.*, [340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951)]; *Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199. . . . The issue in these cases is . . . whether the purpose and effect of the ownership, association, exchange or combination was unreasonable to exclude outsiders from participating in the trade question.
*Metro Cable Co. v. CATV of Rockford, Inc.*, 375 F.Supp. 350, 361 (N.D.Ill. 1974).[33]

From the evidence considered this Court is firmly convinced that Copperweld has not raised a substantial and serious question going to the merits on this claim. Mere suspicions, like conjecture, are of little consequence in any legal proceeding, much less one of this import.

## SECURITIES CLAIMS

■ In dealing with the securities claims the Court must remain mindful of the purpose for which the Williams Act was enacted; to regulate cash tender offers with the welfare of proffered shareholders in mind. The thrust of the amendment is *material* disclosure and probably not a more authoritative statement on the subject could presently be found than Chief Justice Burger's recent instructive:

The purpose of the Williams Act is to insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without *adequate information* regarding the qualifications and intentions of the offering party. By requiring disclosure of information to the target corporation as well as the Securities and Exchange Commission, Congress intended to do no more than give incumbent management an opportunity to express and explain its position. The Congress *expressly disclaimed* an intention to provide a

32. PX 390; PX 391; PX 392; PX 393; PX 394; TR 69–127.

33. Moreover, the suspicion is rendered nugatory by direct countervailing evidence. *See* DX 21.

weapon for management to discourage takeover bids or prevent large accumulations of stock which would create the potential for such attempts.

*Rondeau v. Mosinee Paper Corp.*, 422 U. S. 49, 58, 95 S.Ct. 2069, 45 L.Ed.2d 12, 20–21 (1975) (emphasis added). (Footnote omitted.) It is with this directive that we turn our attention to the following claims.

### COUNT IV—The Leak

The first securities claim asserted by Copperweld is grounded on violations of Sections 9, 10, 13 and 14 of the Exchange Act. Copperweld first learned of Imetal's intention to make a tender offer on the morning of August 29, 1975. Following that communication Copperweld issued a press release—the first public announcement—which made the Dow Jones broad tape at approximately 11:00 A.M. the same day. After an Imetal representative notified the New York Stock Exchange of its intentions on the 29th, trading of Copperweld's shares was suspended.

Plaintiff contends that Imetal leaked its intention to effect a tender offer before the public announcement and thereby violated Section 9(a)(2) of the Exchange Act and Rule 10b–5.[34]

It is further contended that, since Imetal knew of the leak and its purported violation of Rule 10b–5, such matters should have been disclosed in the Schedule 13D and the Offer to Purchase in compliance with Sections 13 and 14 of the Exchange Act. For the reasons stated below we hold that Copperweld cannot prevail on this count.

As a matter of law Copperweld, not being a purchaser or seller of the securities in question, has no standing to assert violations of Section 9(a)(2) and Rule 10b–5. Section 9(e) of the Exchange Act unequivocally states that one " . . . shall purchase or sell . . . " the security before that person can assert the liability of another under subsection (a). 15 U.S.C. § 78i(e).

That plaintiff has no standing to raise a Rule 10b–5 violation was finally put to rest by the Supreme Court's recent sanction of the long-standing "Birnbaum Doctrine"[35] in *Blue Chips Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S. Ct. 1917, 44 L.Ed.2d 539 (1975). While it is true that *Blue Chips* factually represented an action for damages and is thus arguably distinguishable from the equity suit now before us, we are of the opinion that it is nevertheless controlling. Our reading of the majority and concurring opinions leaves no doubt that the Court's holding rested on its construction of Rule 10b–5 and not on the nature of relief requested.[36] We there-

---

**34.** 15 U.S.C. § 78i(a)(2) makes it unlawful for any person—

To effect, alone or with one or more other persons, a series of transactions in any security registered on a national securities exchange creating actual or apparent active trading in such security or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

Rule 10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the *purchase or sale* of any security.

17 C.F.R. § 240.10b–5 (1975). (Emphasis added.)

**35.** Some 23 years ago the Second Circuit ruled that private actions for damages under Rule 10b–5 could only be maintained by actual purchasers or sellers. *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2 Cir. 1952).

**36.** Moreover Copperweld, if permitted to prove such a violation on the merits, seeks damages anyway. Complaint, p. 36, ¶ 4.

fore hold that Copperweld, in waging the instant battle, cannot arm itself with the above-mentioned statutory weapons.

While its legal foundation is non-existent here the Court wishes to also note—in view of the Section 13 and 14 allegations—why plaintiff's factual footing is at best tenuous. In support of its position Copperweld points to the testimony of William R. Morris which reveals that he was contacted by his broker on August 28, told of a French corporation's intention to acquire Copperweld, and advised to buy some of the latter's stock which was then selling for $35.00 a share.[37] Plaintiff further directs our attention to the abnormally high trading volume of its common stock from August 25–28 ("trading surge") as contrasted with the moderate trading figures given for the four preceding months.[38] In this regard the argument surfaces that the leak served as the means by which friendly arbitrageurs could purchase such securities prior to public disclosure for the sole purpose of tendering to Imetal at a substantial premium. Plaintiff further argues that such a device is evidenced by the affidavit of Allan C. Greenberg, a General Partner of Bear, Stearns & Co. (a registered broker/dealer), which urges this Court not to enjoin the tender offer.[39]

[16] The proof adduced, while relevant and inferentially logical, does not however arise to a level warranting fur- ther investigation of improper conduct in our estimation. A leak, to be fraudulent, must be *intentional* and coupling it with the fact of the "trading surge" immediately prior to public announcement does not alone satisfy this Court that a violation may have occurred. Apart from our observation that there exists no direct evidence linking Imetal with the source of the leak[40] we have difficulty (aside from the arbitrageur theory)[41] in understanding how Imetal could benefit from it. Unexplainable and intense trading on the open market would certainly, as it did here, drive the price of the shares upward the resultant effect of which may be to *lessen* the attractiveness of the tender offer.[42]

Copperweld would have us rule that the mere existence of the leak suffices to attribute its origin to Imetal. Considering the nature of the charge we are not so inclined on the record before us. Though speculation is often the game of high finance this Court will not indulge its use when the stakes are this high and the gamble this serious.

### COUNT V—Withdrawal

Count V involves the assertion that Imetal's tender offer provides inadequate opportunity for shareholders to withdraw tendered securities. Section 14(d)(5) provides that the solicited shareholder shall have seven days to withdraw tendered securities after the offeror sends or publishes its tender

---

37. TR 216–20. Mr. Morris' testimony was corroborated by a member of his staff (TR 220–23).

38. For the actual statistical data *see* PX 316.

39. The unsolicited Greenberg Affidavit reveals Bear, Stearns & Co. to be the beneficial owner of 36,800 shares of Copperweld stock.

40. Mr. Morris, under cross-examination, could not identify the source of his broker's information (TR 220). Since the broker he spoke with *was* identified the Court questions Copperweld's failure to depose him. Lack of direct evidence pointing to the de- fendant lends support for drawing the inference that the leak enamated from a source having access to—but not an interest in— the business affairs of Imetal. *See SEC v. Sorg Printing Co., Inc.*, '74–'75 CCH Fed. Sec.L.Rep. ¶ 95,034 (S.D.N.Y.1975).

41. In this regard information concerning *when* Bear, Stearns & Co. bought Copperweld's shares could have been sought and obtained.

42. The August trading figues disclose that Copperweld's shares sold for approximately $29.00 prior to the 25th. On the 28th trading closed at 34½. PX 316. *See* testimony of Robert H. Mundheim (TR 722).

offer.[43] The evidence reveals that the Offer to Purchase, which was initially published in the New York Times on September 4, 1974, permitted shareholders to withdraw their securities until 5:00 P.M. on September 11.[44] The contention is that this prescribed time limitation does not meet the statutory requirement. We cannot agree.

■ Heeding the words of Justice Powell that "[t]he *starting point in every case involving construction of a statute is the language itself*",[45] we can in no way impart to those words plaintiff's reading which, by analogy to F.R.C.P. 6(a), would discount the *day* of publication. The statute plainly states that the offeror must allow the security holder seven days from the *time* of publication. Even assuming that the New York Times was distributed at 5:00 P.M.[46] on September 4, Imetal meets the statutory requirement of seven full days. This claim must fail as a matter of law.

*COUNT VI—The Creeping Tender*

■ Reliance for this claim is placed on Sections 13(d)(1) [47] and 14(d)(1) [48] of the Exchange Act. The former statute requires a person acquiring the beneficial ownership of more than 5% of a registered security to file with various parties a financial statement within ten days. The latter makes it illegal for a person, not having filed a Schedule 13D, to make a tender offer which if consummated would result in more than 5% ownership of such registered securities.

Imetal retained New Court sometime last year for the purpose of screening potential investment target companies. According to Imetal's tender offer, a wholly owned subsidiary of New Court, New Court Capital Management, Inc. (Capital), acquired an aggregate of 108,600 shares of Copperweld's common stock on behalf of certain discretionary and nondiscretionary clients. These shares, representing approximately 4.4%

43. 15 U.S.C. § 78n(d)(5) provides in relevant part:

Securities deposited pursuant to a tender offer . . . may be withdrawn by or on behalf of the depositor at any time until the expiration of seven days after the *time* definitive copies of the offer . . . are first published or sent or given to security holders . . . . (Emphasis added.)

44. PX 315, § 2, p. 2.

45. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 1935, 44 L.Ed. 2d 539, 561 (1975) (concurring opinion).

46. The Court takes judicial notice of the fact that several of the New York Times' daily editions "hit the streets" several times prior to 5:00 P.M.

47. 15 U.S.C. § 78m(d) provides in part:

(1) Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is registered. pursuant to section 78*l* [§ 12] of this title, . . . is directly or indirectly the beneficial owner of more than 5 per centum of such class shall, within ten days after such acquisition, send to the issuer of the security at its principal executive office, by registered or certified mail, send to each exchange

where the security is traded, and file with the Commission, a statement containing such of the following information, and such additional information, as the Commission may by rules and regulations prescribe . . . .

For what the SEC has prescribed *see* 17 C. F.R. § 240.13d–1.

48. 15 U.S.C. § 78n(d) provides in part:

(1) It shall be unlawful for any person, directly or indirectly, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, to make a tender offer for, or a request or invitation for tenders of, any class of any equity security which is registered pursuant to section 78*l* of this title . . . if, after consummation thereof, such person, directly or indirectly, be the beneficial owner of more than 5 per centum of such class, unless at the time copies of the offer or request or invitation are first published or sent or given to security holders such person has filed with the Commission a statement containing such of the information specified in section 78m(d) [§ 13(d)] of this title, and such additional information as the Commission may by rules and regulations prescribe . . . .

of Copperweld's outstanding stock, were purchased between April 23 and June 10 of this year.[49] Imetal filed its Schedule 13D on September 3, 1975.

Plaintiff's theory is that, since Imetal formed the intent to make its tender offer long before effecting the necessary 13D filings, defendant's *indirect* acquisition of the 108,600 shares when coupled with the peculiar August 25–28 trading activity constitutes dubious conduct worthy of further investigation. Again we must state that Copperweld's juxtaposing its "trading surge" theory with the purchase of 108,600 shares of plaintiff's stock by Capital does nothing more than breed conjecture. Moreover, Copperweld's position presupposes that the acquisition of those shares by Capital was made for Imetal. The problem with this premise is that it lacks evidentiary support.

Apart from the fact that Capital is a subsidiary of New Court no connection between those purchases and Imetal has been shown. To the contrary Mr. John P. Birkelund, President of New Court, stated on deposition that these purchases had been made prior to Imetal's selection of Copperweld as the best company and, in any event, his review of the purchases revealed that none were connected in any way to Imetal.[50]

Furthermore, were we to attribute those purchases directly or indirectly to Imetal, the Court does not believe they would constitute a tender offer necessitating compliance with Section 14(d).

*See Gulf & Western Industries, Inc. v. Great A & P Tea Co., Inc.,* 356 F.Supp. 1066, 1073 (S.D.N.Y.1973), *aff'd,* 476 F.2d 687 (2 Cir. 1973); *D–Z Investment Co. v. Holloway,* '74–'75 CCH Fed.Sec.L. Rep. ¶ 94,771 (S.D.N.Y.1974); *Nochman Corp. v. Halfred, Inc.,* '73–'74 CCH Fed. Sec.L.Rep. ¶ 94,455 (N.D.Ill.1973); *Water & Wall, Inc. v. American Consumers Industries, Inc.,* '73 CCH Fed.Sec.L.Rep. ¶ 93,943 (D.N.J.1973).

For the above stated reasons Copperweld has not raised a serious and substantial question going to the merits on this alleged violation.

### COUNT VII—*Financial Condition*

Wholly premised on Section 14(e) of the Exchange Act,[51] this portion of the complaint charges that the Offer to Purchase and Schedule 13D "fail to provide such information concerning the financial position, results of operations and changes in financial position of Imetal . . . .[52]" so as to deny Copperweld's shareholders an opportunity to make an informed decision on whether to tender. Simply because the Schedule 13D and Offer to Purchase have been admitted into evidence there exists no factual dispute as to *what* has or has not been disclosed. Appended to the Schedule 13D are Imetal's 1973 and 1974 Annual Reports. The tender offer discloses that copies of these financials can be obtained through the SEC or New York Stock Exchange library.[53] Despite the above plaintiff charges that the financial information provided is inadequate

---

49. PX 315, p. 14.

50. DX 23, pp. 117–21.

51. 15 U.S.C. § 78n(e) provides:
It shall be unlawful for any person to make any untrue statement of a material fact or *omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading,* or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or

invitation. The Commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative. (Emphasis added.)

52. Complaint, ¶ 57.

53. PX 315, pp. 7–8. A recent decision from a district court within this circuit has held that financials, if deemed material, are not required in the tender offer if otherwise available to the public. *Alaska Interstate Co. v. McMillian,* CCH Fed.Sec.L.Rep. [Current] ¶ 95,276, pp. 98,404–06 (D.Del.1975).

on fourteen grounds,[54] thus contending that the above referenced documents suffer from material omissions. Moreover it is argued that the information that was disclosed is materially misleading.

■ Plaintiff's principal argument is that because Imetal's financial disclosures for 1973 and 1974 were not prepared according to generally accepted American accounting principles they present a distorted view and thus do not comply with Section 14(e). This contention stems from the testimony of James B. Miller, a C. P. A. and partner in the accounting firm of Haskins & Sells, who pointed out many and, to him, significant differences between the French and American standards. It is also charged that Imetal's financials do not comport with SEC Regulation S–X. Imetal, while adamantly maintaining that financial information is not even required under Sections 13(d) and 14(d)(1), contends that in any event it has effected the tender offer in conformity with the law. Examination of these statutory provisions bears out defendant's primary position. Indeed, the legislative history of the Williams Act is indicative of the very language deployed in Section 13(d)(1)(A)–(E):

> The bill would correct the current gap in our securities laws by amending the Securities Exchange Act of 1934 to provide for full disclosure in connection with cash tender offers and other techniques for accumulating large blocks of equity securities of publicly held companies. Under this bill, the *material* facts concerning the *identity, background, and plans* of the person or group making a tender offer or acquiring a substantial amount of

securities would be disclosed. H.R. Rep.No.1711, U.S.Code Cong. & Admin.News, 90th Cong. 2d Sess. pp. 2811, 2814 (1968) (emphasis added). Since the SEC is accorded broad rulemaking authority under these sections we note further that the rules established thereunder do not require disclosure of financial information about the offeror. *See* 17 C.F.R. §§ 240.13d–101 and 240.14d–101 (1975).

The expert testimony of Professor Robert H. Mundheim logically explains why Congress probably felt no such requirement was necessary, to wit: When the offeror is seeking to exchange its *stock* for the offerees' shares in the target there is indeed good reason for painting the financial picture, but when the offeror is exchanging *cash* for those shares the offerees' primary consideration is whether the money is available.[55] Copperweld counters with the assertion that financial information is nevertheless required because some non-tendering offerees may desire to become minority shareholders in the newly-acquired company. This well taken point has received judicial recognition. In contrasting the *cash offer* situation with that of the *exchange offer* (where the financial condition of the offeror is unquestionably material) Judge Stapleton less than two months ago observed:

> In a cash tender offer situation, as opposed to an exchange offer, the Commission has not required the inclusion of financials even though it has frequently been pointed out that such financials would be of some interest in making decisions with respect to the tender. An ability to make an *evaluation of the general health of the tenderor* and the quality

---

54. Complaint, ¶ 59, pp. 23–25. For example, Copperweld complains that "[t]he basis at which fixed assets are carried is not stated . . . " (¶ 59(c)), and that Imetal did "not follow the principles of equity accounting as would be required under generally accepted accounting principles and Regulation S–X promulgated by the SEC". (¶ 59(h).) Examination of this Count indicates that the

alleged inadequacies lie not so much with the disclosures as with the manner—French accounting standards—in which such information was prepared.

55. TR 724–25. We note here that plaintiff is not disputing the defendant's ability to pay for the shares tendered. *See* note 78, *infra* and accompanying text.

of its management may well be of interest to the stockholder in a cash tender in *deciding whether and to what extent he may be willing to cast his lot with the offeror's plans for the future. Alaska Interstate Co. v. McMillian,* CCH Fed.Sec.L.Rep. [Current] ¶ 95,276, p. 98,405 (D.Del. 1975) (emphasis added).[56]

It is quite evident to this Court that the statutory scheme does not require financials to be provided in a case where cash is to be exchanged for all shares. As we stated earlier the touchstone of the Williams Act is *material* disclosure so as to enable a prospective investor to make an informed decision. The thrust of this 14(e) claim is of course geared to protect those Copperweld shareholders who may not tender but might well find themselves in the minority of a newly-acquired (and controlled) company. Thus it is further argued that what has been disclosed is inadequate to enable this segment of shareholders to make an intelligible choice.

> The materiality of facts allegedly *misstated* or *omitted* depends, in turn, upon whether a *reasonable investor* might have considered them to be important in deciding whether to accept the tender offer. *Sonesta International Hotels Corp. v. Wellington Associates,* 483 F.2d at 251 (emphasis added).

With that standard in mind and upon further study we are inclined to agree with Copperweld that, *under appropriate circumstances,* financials can be required under Section 14(e). *Corenco Corp. v. Schiavone & Sons, Inc.,* 362 F. Supp. 939 (S.D.N.Y.1973), *aff'd,* 488 F. 2d 207 (2 Cir. 1973); *see Missouri Portland Cement Co. v. Cargill, Inc.,* 375 F.Supp. 249 (S.D.N.Y.1974), *aff'd in*

*part, rev'd in part,* 498 F.2d 851 (2 Cir. 1974), *cert. denied,* 419 U.S. 833, 95 S. Ct. 150, 42 L.Ed.2d 123 (1974).

Copperweld places chief reliance on the district court's decision in *Corenco* because there it was squarely held that failure of the offeror to provide financials in its 13D statement and tender offer was a material omission under Section 14(e). Plaintiff Corenco sought and was granted an injunction against a cash tender offer for part of its stock by the closely held defendant (Schiavone). Schiavone did not provide *any* financial information about itself and, being privately owned, the shareholders of Corenco had no public access to such information. In holding that failure to disclose financial inormation constituted a material omission in violation of 14(e) the court pointed to the *source of funds* from which Schiavone could repay the bank loan it had taken to finance the transaction as one example of how financials can be material. *Corenco supra,* at 949. The court, in rejecting Schiavone's argument that information not required by Section 14(d) and Schedule 13D is similarly not mandated by 14(e), cited at p. 949 *Sonesta International Hotels Corp. v. Wellington Associates, supra,* and *Gulf & Western Industries v. Great A & P Tea Co., supra,* for authority to the contrary.

In *Sonesta* the omitted information that was not specifically enumerated within 14(d)(1) but held to be material for purposes of 14(e) was (1) the size of a debt owed by the offeror to the target, (2) the effect of the offeror's decision to abstain from voting on certain items at the target's annual meeting, and (3) disclosure that the takeover bid, if successful, could result in the common stock of Sonesta being delisted on the

---

56. In *Corenco Corp. v. Schiavone & Sons, Inc.,* 488 F.2d 207, 214, Judge Mansfield makes this somewhat similar observation: Ordinarily a stockholder receiving a tender offer is primarily interested in the cash price. Although he may decide not to accept an offer if he believes that the proposed takeover of control will strengthen his investment and the offeror is not exactly anxious to encourage such a course, it is clear that if all stockholders rejected the offer, there would be no such strengthening of his investment. Hence, *the offeror's financial condition is at best a secondary factor.* (Emphasis added.) (Footnote omitted.)

New York Stock Exchange. 483 F.2d at 251–54. In *Gulf & Western* the undisclosed information held material was (1) the offeror's intent with respect to gaining control and replacing A & P's management and (2) the possibility of antitrust violations spawned by the acquisition. 476 F.2d at 695–97.

Putting aside the fact that the above two cases relied upon by the district court in *Corenco* did *not* require financial information we recognize other reasons for according *Corenco* less authoritative weight. Since Schiavone elected to comply with the lower court's order the Second Circuit had no occasion to consider that substantive issue. 488 F. 2d at 213. The principal question on appeal was whether the District Judge improvidently granted Schiavone permission to make curative amendments to its tender offer. The Second Circuit did however seem to play down the importance of financials in situations unlike *Corenco.*[57] At any rate, we cannot subscribe to Copperweld's argument that *Corenco* supports its position that more and comprehensive financial disclosure is required of Imetal because it, being a foreign multinational conglomerate, confronts Copperweld shareholders in a manner not unlike Schiavone did Corenco's shareholders.

The manifest distinctions between *Corenco* and this case must render it inapposite. Schiavone provided *no* financial information while Imetal has presented its statements for 1973 and 1974.[58] In *Corenco* the court was bothered by the non-disclosure of *how* the

defendant would honor the loan to be used for the tender offer whereas here Imetal's ability to service the debt has not been questioned except for one allegation (now abandoned) in Count IX of the complaint.[59] Schiavone's tender offer was limited to 130,000 of the 378,567 total outstanding *Corenco* shares whereas Imetal has offered to purchase *all* of Copperweld's shares.[60] In light of these significant distinctions and the necessity of applying the materiality test on a case-by-case basis we are persuaded that it does not control the one at bar.

■ To clarify we see no need to decide the question of whether Imetal was required to file financials because, having done so, the issue is moot. With regard to whether it must file *more* financials the law reviewed above persuades the Court to conclude that it does not. The issue of whether the financials that have been filed are materially misleading must also be resolved in Imetal's favor.

It is difficult to accept the thesis that Section 14(e) is violated merely because the financials were prepared according to French law when it is questionable that financials are even required. Moreover Mr. Miller, after telling us that Imetal's annual reports did not conform to Regulation S–X, admitted on cross-examination that Regulation S–X is not applicable to tender offers.[61] Certainly the fact that there are differences between the two accounting methods was not utilized to deceive unwary investors because the defendant made light of that

---

57. *Id.*

58. Imetal's 1973 and 1974 Annual Reports (translated) are appended to its Schedule 13D and are publicly available to all interested shareholders. *See* PX 315, pp. 7–8. Plaintiff takes issue with the fact that similar information is lacking for 1975. Keeping in mind that Congress has not required such information and that *Corenco Corp. v. Schiavone & Sons, Inc.,* supra, is the only case on *its particular facts* to render financials material under 14(e), we advert to the following excerpt from Imetal's Offer to Purchase:

Although the Purchaser's 1975 results will be adversely affected by worldwide recession and softness in metal markets and prices, such factors will in no way impair its financial ability to perform its obligations under the Offer. PX 315, p. 7.

59. *See* note 78, *infra* and accompanying text.

60. Here, unlike *Corenco*, there does not exist the certainty that some of Copperweld's shareholders will be locked-in with the successor.

61. TR 580.

fact in the tender offer.[62] Which now brings us to the question of whether these technical differences are materially misleading. On this point Copperweld rests primarily on the value difference between the franc and the dollar and the manner in which Imetal reflected its true worth in the tender offer. It is a fact that the tender offer gives information concerning assets, equity, etc. in terms of francs however on the same page the dollar-franc exchange rate is given as of August 28, 1975.[63] The best evidence we perceive for Copperweld here was introduced by Imetal in the form of an affidavit of Jacques Frinault, a French auditor, who analyzed the subject financials with the assistance of Price Waterhouse & Co.[64] The affidavit and accompanying report indicate that American adjustments would not have caused appreciable differences except for the manner in which certain assets and shareholders' equity are recorded. Thus Price Waterhouse concluded that group net income for 1974 "would be understated by approximately FF533 million if the group had applied [American] accounting principles . . . ."

Admittedly the difference is noteworthy but in applying the test of materiality we must be realistic. The adjustment in our opinion does not alter, as Judge Stapleton said, the "general health of the tenderor" or even undermine the tenderor's ability to pay for the shares tendered. We must not forget that these shareholders are being offered $42.50 per share for stock that prior to August 28 rarely, if ever, sold for more than $36.00. On the facts of this case we do not believe that reasonable investors would consider important the above discrepancy in arriving at a decision on whether to tender; nor the fact that Imetal failed to, *inter alia*, state the basis it used for determining the value of inventories or list the details of its pension plan.[65]

■ After fully examining the disclosures that were made in the tender offer and Schedule 13D in light of the law which has been reviewed above, we conclude that Copperweld has not raised any substantial questions which would require further litigation on the merits relative to this Count.

*COUNT VIII–The Purpose*

Based on Sections 14(d) and (e) Copperweld next claims that Imetal failed to adequately disclose its purpose for making the tender offer. Section 14(d)(1) requires a tender offeror to file a statement with the SEC prior to publication of its tender offer. This statement must set forth certain information prescribed by Section 13(d) and the regulations promulgated thereunder. Item 4 of Regulation 13D requires the offeror to state the purpose for the proposed transaction.[66] Imetal declared its *Purpose of Transaction* (Declared Purpose) in Item 4 of its Schedule 13D and Offer to Purchase.[67]

Plaintiff essentially contends that a portion of the Declared Purpose is violative of 14(d) for failure to state required information and 14(e) because it contains untrue statements of material facts and fails to state material facts which are necessary to make the statements made not misleading. Specifically, the gravamen of this claim is that

---

62. PX 315, p. 7.

63. *Id.*

64. DX 22.

65. Complaint, ¶ 59(f) and (k).

66. Item 4, Purposes of transaction.
State the purpose or purposes of the purchase or proposed purchase of securities of the issuer. If the purpose or one of the purposes of the purchase or proposed purchase is to acquire control of the business of the issuer, describe any *plans or proposals* which the purchasers may have to liquidate the issuer, to sell its assets or to merge it with any other persons, or *to make any other major change in its business or corporate structure.* . . . 17 C.F.R. § 240.13d–101. (Emphasis added.)

67. PX 314, pp. 5–8 and PX 315, PP 11–12.

Imetal has failed to " . . . describe any plans or proposals which the purchasers may have . . . to make any other major change in [Copperweld's] business or corporate structure . . . ." To support its charge Copperweld principally relies on the two passages we quote below:

> Except as stated herein, the Purchaser [Imetal] does not have any plan or proposal to liquidate the Company [Copperweld], to sell its assets, to merge it with any other person or to make any other major change in its business. Nor does the Purchaser have any present intention to make any changes in the Company's management.

> \* \* \* \* \* \*

> However, none of these criteria or objectives has resulted in the formulation by the Purchaser of any plans or proposals with respect to the Company.

Interposed between the above passages is language which informs the reader that, once detailed business information about Copperweld is obtained, Imetal may make some changes in accordance with the criteria and objectives therein discussed.

▮▮▮▮▮ In support of its position that Imetal had such plans and proposals when it made the tender offer Copperweld directs our attention to various documents and testimony. Before getting to the evidence we wish to note for purposes of clarity that plaintiff posits four separate plans or proposals that Imetal had formulated prior to the offer. They can be summarily stated as Imetal's prior intention to:

(1) integrate Copperweld into The Group [68] and subordinate its interests to that of Imetal's holdings;

(2) use Copperweld as a basis for more acquisitions in America;

(3) effect a dividend policy which seeks 50% of earnings;

(4) export management and technological know-how.

In measuring what has been disclosed in the Declared Purpose against what has not the Court should remain mindful of the materiality test as well as the words of Judge Ainsworth in *Susquehanna Corp. v. Pan American Sulphur Co.*, 423 F.2d 1075, 1085 (5 Cir. 1970):

> The person or corporation filing a Schedule 13D statement need not necessarily walk a tortious path. He must, of course, be precise and forthright in making full and fair disclosure as to all *material* facts called for by the various items of the schedule. At the same time he must be careful not to *delineate extravagantly or to enlarge beyond reasonable bounds.* (Emphasis added.)

### Integrate and Subordinate

Copperweld objects to the non-disclosure by Imetal of its intention to have Copperweld become the "fourth leg" of The Group in three to five years.[69] The documents cited in the margin indicate that Imetal's objective here—indeed "[i]ts goal"—is one of hope. We are of the opinion that Copperweld confuses an infant desire with a mature and viable proposal. *See Electronic Specialty Co. v. International Controls Corp.*, 409 F.2d 937, 948 (2 Cir. 1969). Moreover if that representation were made and five years from now Copperweld, not having lived up to expectations for some unforeseen contingency, has not been designated one of Imetal's principal operating subsidiaries it will have violated the law by overstatement. *See Missouri Portland Cement Co. v. Cargill, Inc., supra,* at 872; *see also Jewelcor Inc. v. Pearlman*, '74–'75 CCH Fed.Sec.L.Rep. ¶ 95,-096, p.97891 (S.D.N.Y.1975). Again we

---

68. Imetal has three principal operating companies which are collectively referred to as "The Group". They are Societe Miniere et Metallurgique de Pennarroya (Pennarroya), Societe Metallurgique Le Nickel—SLN (SLN) and Compagnie de Mokta (Mokta). *See* PX 311.

69. PX 400, p. 459; PX 167, p. 1; PX 14, p. 10.

think it would be wise to heed the words of Judge Ainsworth in *Susquehanna Corp., supra* at 1085–86:

> Though the offeror has an obligation fairly to disclose its plans in the event of a takeover, it is not required to make predictions of future behavior, however tentatively phrased, which may cause the offeree or the public investor to rely on them unjustifiably.

We should remember too that the law only requires disclosure of plans or proposals to make *major changes* in Copperweld's business or corporate structure. There has been no evidence by Copperweld to show how its integration into The Group would cause substantial, if any, change in the conduct of its business structure or operations.

As for subordination plaintiff contends that the takeover, if successful, would result in its being no longer permitted to operate as an independent concern. The basis for this assertion is found in the Chairman's Address of the 1974 Annual Report where it is stated that Imetal's subsidiaries will be run in a central and unified manner.[70] Indeed this is one of the fundamental purposes of a holding company and Imetal labels itself as such in the tender offer. Are we to assume that a reasonable investor does not know the function of a holding company? We think not. The subordination theory additionally suggests the possibility of Imetal's extracting profits from Copperweld for purposes of self-aggrandizement and/or embellishment of The Group. While it is true that this acquisition can help Imetal grow in the specialty metals industry we find anomalous the contention that it would squander Copperweld's financial resources. The premise defies sound business logic and, in view of the sizeable cost of the gambit, is unrealistic.

### More Acquisitions

Here there is no question that Imetal, once it gets a foothold in this country through acquisition of Copperweld, would *like* to expand and diversify.[71] However the evidence also reveals that such an intention is tentative.[72] Of course using Copperweld for further growth would largely depend on what its financial health could bear. In this regard Imetal, while stating to Copperweld shareholders the criteria and objectives it considers in formulating plans for change, points to " . . . the ability of an acquired company to grow internally *and by acquisition.* (Emphasis added.) The disclosure is there.

### Dividend Policy

Here plaintiff points to the fact that for five years its average share of earnings allocated for dividends has been 32 per cent.[73] Since Imetal's internal documents reflect the intention to allocate 50 per cent of earnings for dividends[74] Copperweld contends that such an intention should have been disclosed. Apart from the further fact that these documents were drawn while Imetal was screening prospective targets for acquisition and that the 50 per cent figure was only an approximation of what Imetal *would like* to realize as a return on its investment, the Copperweld shareholder is forewarned of " . . . the possibility of a substantial cash yield on [Imetal's] investment. . . ." Moreover this statement was made after Imetal indicated that it would study "detailed information" about Copperweld before implementing such a policy. For any number of business reasons, if and when Imetal gains control of the board, it might not be economically feasible to declare such a dividend policy. As Judge Friendly wisely observed in dis-

---

70. PX 314, Ex. G, p. 1.

71. PX 276, pp. 1–2; PX 400, pp. 428–29.

72. Actually Imetal's Chairman testified that there is presently no plan to diversify. (TR 413–14.) He also testified with regard to

PX 276 that diversification can be likened to his Christmas wish. (TR 416–17.)

73. DX 1, p. 16.

74. PX 167, pp. 1–2; PX 14, p. 10.

cussing Rule 14d–1(c) and Schedule 13D, "[i]t would be as serious an infringement of these regulations to overstate the definiteness of the plans as to understate them". *Electronic Specialty Co. v. International Controls Corp., supra* at 948. We thus view the above disclosure as adequate.

### Know-How

With respect to category No. 4 we shall not discuss the evidence favorable to Copperweld [75] because the Declared Purpose clearly discloses that Imetal may require " . . . interchange of personnel and experience"; and we fail to see how such a statement is misleading. There is certainly nothing inherently illegal about a parent transferring expertise in a particular industry from one of its subsidiaries to another. If a Copperweld shareholder reads the excerpt as possibly diluting a good management team [76] he may tender while another shareholder, viewing the reciprocity potential as a means for growth, may not. In our judgment the disclosure was adequate.

With a view of the law as recited above and considering the disclosures that have been made, to foist upon Imetal the obligation of revealing the specifics of every plan or proposal that it would someday like to implement, merely because it is a foreign corporation, has many subsidiaries related to the metals industry, and conducts its operations on a global basis would, in our estimation, be wholly unjustified.

### COUNT IX—Miscellaneous Omissions

This claim alleges that the tender offer is defective in nine respects for failure to state material facts under Section 14(e). These allegations can be stated in summary fashion as follows:

(a) no financial information for 1975 was provided;

(b) the market price for Imetal's capital stock is not disclosed;

(c) failure to state that repayment of the funds borrowed by defendant to finance the transaction may come from Copperweld's assets and profits;

(d) inadequate information relative to defendant's intention should it not succeed in gaining control;

(e) failure to reveal the identity of those persons Imetal will place on Copperweld's Board of Directors;

(f) not disclosing its intention with respect to reselling the securities it may purchase;

(g) inadequate information concerning the adverse effect world-wide recession will have on Imetal's 1975 results;

(h) no disclosure pertaining to the likelihood that this acquisition will violate federal antitrust laws; and

(i) failure to state that Amax, Inc., a part owner of Imetal, is presently embroiled as a defendant in an antitrust suit.

 It is our considered opinion that points (a) and (g), being related to defendant's financial condition, have been adequately addressed pursuant to our discussion of Count VII. However, because Imetal stated in the tender offer that its "1975 results will be adversely affected by worldwide recession and softness in metals markets and prices . . . ," we should note that such disclosure is, under the circumstances, quite appropriate. (*See* Count VIII discussion and cases cited therein.)

 In scrutinizing plaintiff's brief we have come to the conclusion that points (b), (f) and (i) have been abandoned. In the event their resurrection is attempted on appeal we briefly note these observations: aside from having little, if any, materiality in a cash-exchange situation the Court judicially notices that Imetal's stock market quota-

---

75. PX 258, p. 3; PX 14, pp. 9, 16.

76. There is certainly no present intention to export Copperweld's management. TR 347–48.

tions are published daily.[77] *Cf. Alaska Interstate, supra,* at 98, 404–06; regarding (f) and (i) we fail to see the materiality of such a disclosure.

■ Point (c) as stated above has its origin in the complaint[78] however on brief plaintiff's 'position has been amended to charge an outright falsehood with respect to defendant's *source of funds* disclosure.[79] Here Copperweld claims that defendant has failed to accurately disclose the source(s) of funding to be used to purchase the securities. As plaintiff correctly points out the tender offer discloses that the sum of $118 million estimated to finance the purchase would be supplied from Imetal's general funds and other monies raised pursuant to credit granted by a consortium of French banks represented by Banque Rothschild.[80] Copperweld contends that this representation is contradicted by the testimony of Mr. Villemejane which indicates that another loan from Compagnie des Mines de Huaron (Huaron) was arranged in late August 1975 for the purpose of financing the purchase of Copperweld's securities.[81] Defendant contends however that Mr. Villemejane's testimony also indicates that the proceeds of that loan were not to be used for servicing the tender offer.[82] Thus the Court is faced with an apparent contradiction. Our examination of the testimony on this point leads us to believe that Mr. Villemejane may have been confused or was not totally aware of the specific arrangements since his President of Finance, Mr.

Painvin, was in charge of handling the loan agreement.[83] Moreover, after heated argument on this point we are convinced that the source of funding was not falsified.[84]

■ We think points (d) and (e) are hardly material to a cash offer situation and furthermore, unlike the assertions made in Count VIII, the record on these points is devoid of evidence pointing to defendant having such intention or possessing such information.

■ Regarding point (h) Copperweld feels that in order to meet the materiality test Imetal should have described the nature and seriousness of the antitrust implications in its tender offer. It appears that nothing short of admitting guilt would satisfy plaintiff on this score. Depending on the circumstances of the case only the *possibility* of an antitrust violation need be disclosed in any event. *Missouri Portland, supra,* at 872, n. 44. The two disclosures pertaining to the antitrust laws we detect in the tender offer[85] amply satisfy that requirement.

### COUNT X—The Ohio Suit

■ Copperweld's final securities claim concerns the suit against Imetal now pending before an Ohio state court which involves purported violations of the Ohio Securities Act.[86] It takes issue with the particular statement in the tender offer that disavows knowledge of any domestic governmental approval that would be required for the acquisition.[87] Because of evidence that

77. *See e. g.,* Wall Street Journal, August 21, 1975 at 22; Wall Street Journal, September 3, 1975 at 27; Wall Street Journal, October 14, 1975 at 44.

78. Complaint, ¶ 71(c), p. 32. We also feel that the "ability to repay" theory has been discarded probably because no evidence exists to suggest that Imetal could not honor its financial obligations.

79. Plaintiff's Post Hearing Memorandum, pp. 62–64.

80. PX 315, § 8, p. 11.

81. *See* PX 400, pp. 326–28, 480.

82. PX 400, p. 512.

83. *Id.* at 513.

84. *See* AR 128–31; 140–43.

85. PX 315, § 6, p. 7; *Id.,* § 15, p. 15.

86. *See* PX 404, 405.

87. Specifically Imetal stated:
The purchaser is not aware of any approval or action by any United States or foreign governmental or administrative agency (other than the French governmental approval referred to in Section 14 hereof which has been obtained) which would be required for the acquisition of the Securities by the Purchaser as contemplated herein. PX 315, p. 6.

clearly indicates Imetal was aware of the Ohio statute almost two months prior to making the tender offer [88] Copperweld contends that this representation constitutes a material misstatement and omission of a material fact in violation of Section 14(e).

We would agree with plaintiff that the statement constitutes a misrepresentation of fact if Imetal knew or had good reason to believe that approval by the Ohio authorities was *required.* In a memo dated July 10, 1975 (PX 279) Guy de Rothschild, Imetal's Chairman, notes the impression that the statute is not applicable to his company. Attached to a letter dated July 24, 1975 are several statements by Mr. Villemejane, Imetal's Managing Director, which indicate an intention to prepare for compliance with the Ohio law (PX 371), however the very next day Mr. Villemejane was notified that legal counsel had been retained to advise Imetal on the statute's applicability (PX 370). From the evidence of record we cannot state with assurance that Imetal knew or had good reason to believe that it was required to comply with the Ohio law. On the contrary, Imetal's counsel has stated that defendant was merely following the legal advice rendered.[89] As far as we are informed Imetal still believes the statute to be not applicable to it with regard to this tender offer. In light of the record we believe the defendant has made a most accurate and appropriate disclosure.

### RELIEF

We now arrive at the point of actually deciding whether plaintiff has met its burden for injunctive relief. Copperweld implores the Court to measure its request by the following standard set forth in *Sonesta International Hotels Corp. v. Wellington Associates, supra* at 250:

The settled rule is that a preliminary injunction should issue only upon a

clear showing of either (1) probable success on the merits *and* possible irreparable injury, *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardship tipping *decidedly* toward the party requesting the preliminary relief. (Italics in original.) (Emphasis added.)

In applying the first prong of standard (2) to plaintiff's case we have found only Count I to be of merit. To the extent that standard (2) appears to disregard irreparable harm we believe it to be contrary to recent authority, *see Rondeau v. Mosinee Paper Corp.,* 422 U. S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975), and accordingly we shall apply the test laid down in *Delaware River Port Authority v. Transamerican Trailer Transport, Inc.,* 501 F.2d at 919–20.

With respect to irreparable harm Copperweld relies on many of the "predictions" it forecasts through some of the nine counts we found devoid of merit.[90] For example it is urged that a successful takeover might result in vertical integration thus disrupting plaintiff's supply lines with present suppliers. Not only did the evidence show this contention to be unfounded but should it come to pass we fail to see how Copperweld would be harmed. There is the further assertion that Imetal will "milk" plaintiff's profits, know-how, experience etc. for the benefit of its subsidiaries. This too is not supported by the evidence and in our judgment runs contrary to reason and reality.

The only valid point Copperweld makes on irreparable injury is the possibility of divestiture should the injunction be denied and it is ultimately determined that this would-be acquisition is violative of the "potential-competition doctrine" under § 7. There is no doubt that such proceedings have a debilitating effect on the acquired company especially when it becomes so inextricably

---

88. PX 371, § 2, p. 2; PX 370; PX 279, p. 1.

89. AR 132–33.

90. *See* Plaintiff's Requests for Findings Nos. 89–101.

bound up with the parent. With divestiture in mind plaintiff again reminds the Court of the non-tendering shareholders who, it is urged, can never be made whole should divestiture result.

Assuming, however, that the injunction is granted Imetal, in the eyes of the layman, is a violator of the law. Assume further that a few years from now Imetal is vindicated on the merits of a full trial. Will the Offer to Purchase still be open, or more realistically, will defendant continue its offer at all? The grant of an injunction means further delay for the defendant and delay is plaintiff's strong ally. Delay also breeds uncertainty in the market place and that possibility leaves the security holder who *does* want to tender in a precarious position. In balancing the equities the Court must also consider possible harm to other interested persons as well as the public interest. *Delaware River, supra,* at 920.

We have likewise considered the alleged plight of the union which is that this acquisition could result in the impairment of a presently healthy attitude between it and Copperweld's management. The union bases this plea on its belief that defendant is not labor conscious and because dealing with a "Paris-based absentee owner" could lead to strained labor relationships. We are not swayed by this position because Imetal must abide by our labor laws if it is to do business in this country and, furthermore, the facts reveal that the union would be dealing with the same Pittsburgh-based management.

This case appears to have captured the public's fancy and while the public interest is important it can be discarded here as negligible. There are those in the public sector who would have the Court enjoin defendant merely because the thought of foreign control of American business is revolting. The argument eventually extends, considering the weakness of the dollar and our present struggle with the OPEC nations, to one of national security. There are others who point to the principle of economic reciprocity and adamantly maintain that infusion of foreign capital is just what our economy needs. The arguments are off-setting and, in any event, this Court shall treat foreign investment exactly like domestic investment in the absence of Congressional guidance.

██ Upon careful reflection the Court views Copperweld's case, on the whole, as weak. Much of its attack on this tender offer rests solely on speculation. It has charged that defendant is going to do this and do that yet very little support has been garnered to substantiate the accusations. The only charge sustainable at this stage is premised on a theory in which defendant's intent and future plans are not of pivotal importance. Count I was found for plaintiff under a less stringent standard since it does not appear likely that success will obtain on the merits. It is our opinion that any possible harm flowing from this acquisition must stem from Count I and no other.

In essence the party with the paramount interest in this suit is the shareholder and, in the absence of a compelling reason, we do not believe that one's right to deal with *his* property in the market place should be abridged. The tenuous possibility of divestiture does not present such a compelling reason given the circumstances of this case.[91] In balancing the equities the Court firmly believes that the scale does not tip in plaintiff's favor.

The request for injunctive relief must therefore be denied.

Findings of fact and conclusions of law have not been separately stated but are included in the body of the foregoing opinion as specifically authorized by 52(a) of the Federal Rules of Civil Procedure.

An appropriate order shall be entered.

---

91. By this opinion we have merely held that plaintiff is entitled to try the issue of potential competition. At this stage we cannot say that it is likely to succeed.